**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-344-1 (JDB)** |
| | : | |
| **BRANDON NELSON,** | : | |
| | : | |
| *Defendant.* | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Brandon Nelson to 14 days of incarceration and $500 in restitution.

### I.      Introduction

Nelson participated in the January 6, 2021, attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $1.4 million worth of property damage.

Nelson stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officers, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.

The government is requesting 14 days of incarceration based on an assessment of relevant sentencing factors.  Despite witnessing substantial evidence of a violent riot and destruction of

property at the Capitol, Nelson—who spent approximately six years as a member of the Air National Guard and an additional two years as a Reservist—unlawfully entered the building at the Senate Wing Door, less than five minutes after rioters had smashed windows on either side of the doorway to gain entry.  He and his friend and codefendant, Abram Markofski, remained inside and entered different parts of the building for well over an hour, an unusually long incursion compared to other Capitol-breach defendants.  After the riot, he shared texts with his codefendant that they "held the line" and did not "back[] down," and appeared to agree with Markofski that this behavior was patriotic.  At the same time, Nelson submitted to two voluntary interviews with the Federal Bureau of Investigation ("FBI") (though he minimized his conduct in those statements), consented to a search of his apartment, alerted the FBI where evidence could be found in his residence, and expressed a prompt desire to accept responsibility.

## II.    **Factual and Procedural Background**

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the Capitol in ECF No. 41, at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### *Nelson's Role in the January 6, 2021, Attack on the Capitol*

Nelson and his friend Markofski traveled from the Madison, Wisconsin, area to attend the rally President Donald Trump planned to hold in Washington, D.C., on January 6, 2021.  After arriving in Washington and attending the rally, they eventually made their way to the Capitol together.

Nelson admitted to the FBI that he noticed civilians on scaffolding and police shooting pepper balls outside the Capitol.  Capitol surveillance video showed he and Markofski entered the Capitol at the Senate Wing Door—where rioters had smashed windows beside the doors at approximately 2:12 p.m.—at approximately 2:16 p.m.  Approximately 15 seconds before they crossed the threshold, a rioter could be seen climbing through a broken window (circled in red) as other rioters cascaded through the doorway without any manner of security screening, as pictured below:



These two sequential screenshots, plus a closeup of the second screenshot, below, show Nelson, wearing a gray jacket and red ballcap turned backwards, and Markofski crossing inside the Senate Wing Door (circled in yellow), with visible broken glass and debris on the ground beneath both windows on either side of the doorway:







Capitol surveillance video captured Nelson and Markofski inside the Capitol Crypt at approximately 2:20 p.m.  Shortly before Nelson and Markofski arrived there, the video shows rioters converged on a line of officers in the Crypt, and within minutes, the officers were overwhelmed.  At one point, Markofski held up his cellphone in the area and nodded his head affirmatively as others appeared to chant, and Nelson clapped his hands for a couple seconds, as depicted in these screenshots (circled in yellow in first screenshot):





Other rioters at the front of this mob scuffled with officers.  By 2:25 p.m., rioters overran the officers in the Crypt, the defensive line broke, and the mob gained access to other parts of the building.

At approximately 2:34 p.m., Nelson texted his mother, "We are in capitol." At approximately 2:41 p.m., he sent his mother a brief video he recorded on his cellphone of a mob inside the building chanting, "Stop the Steal." During his time inside the Capitol, Nelson also entered the Capitol Rotunda, as depicted in this photo and closeup (Nelson circled in yellow):





At approximately 3:30 p.m., Nelson texted his mother, "I got maced."  At approximately 3:40 p.m., he texted her again, "There's shit everywhere."  Nelson admitted to the FBI that as he left the Capitol, he saw the doors he exited had been "smashed."

After the riot, Nelson and Markfoski returned to Wisconsin.  From approximately 1:19-1:20 a.m. (CST) on January 7, 2021, Nelson texted Markofski, "We held the line . . . No backing down."  Markofski replied, "Fuck. Yeah, brother is Patriots won't go down without a fight."  Nelson responded, "Not I."

The FBI did not uncover evidence that Nelson personally engaged in violent or destructive conduct at the Capitol grounds or inside the Capitol.  Nelson submitted to voluntary interviews with the FBI both before and after his arrest.  He further cooperated with law-enforcement officials by giving consent to search his apartment and identifying where clothing evidence was located.

*Nelson's Interviews with the FBI*

According to the FBI, in his pre-arrest interview on January 18, 2021,[1] Nelson admitted observing "approximately 10-20 people go to the scaffolding that was covering the stairs" outside the Capitol and seeing "some people cutting into the scaffolding."  He also admitted he and Markofski were in a domed room "for approximately 20 minutes before following the crowd into another room."  At some point, police officers "started to push back and attempt to clear the rooms," so he "started walking backwards and left the U.S. Capit[o]l at approximately 3:30 p.m."  He said if he "had it to do over again," he would not have traveled to Washington and would not have entered the Capitol, but he did not realize that it was not open to the public like the Wisconsin state capitol is open to the public.

---

[1] Quotations from the pre-arrest interview are derived from FBI's summary of what Nelson stated and not Nelson's verbatim statements.

In his post-arrest interview with FBI agents on May 3, 2021, Nelson admitted he was outside the Capitol for approximately an hour or hour-and-a-half.  He observed people "standing on scaffolding" and officers "shooting pepper balls" at those people for about 45 minutes to an hour.  "At a certain point," the officers "weren't there anymore," "barricades [were] removed," a "flow" of individuals began entering the building, and he and Markofski were "part of that crowd."

Nelson asserted that when he got to the doors where he and Markofski entered, "there was no officers . . . the doors were open."  An FBI agent responded that by then, windows were smashed on either side of the doors and the doors had been forced open and stated, "that doesn't look good." Nelson nodded affirmatively and said, "No, I hear what you're saying."

Nelson also admitted he was in the Rotunda area of the Capitol before he left the building. He said it was difficult to move inside the building because of the congestion of people and admitted seeing rioters accosting police officers as those rioters "pushed and shoved" to get out of the building.

Near the end of his post-arrest interview, Nelson said, "If I could go back in time, I probably just wouldn't have gone. . . .  When you're in a big-ass crowd like that and stuff is just moving, you don't really have the time to really think."  While acknowledging "some people smashed windows, whatever, other stuff, obviously," he also stated, "from what I know in Madison, the Capitol is a public building, that you can go into it almost any time."  When an FBI agent asked if, after seeing the windows smashed, Nelson questioned whether he "shouldn't be in here," Nelson admitted seeing "some red flags," but also claimed he saw "kids in there" and "moms in there" and "grandpa and grandma" at the Capitol.  Nelson suggested he, like others, "got caught in the wrong place at the wrong time."

Nelson knew at the time he entered the Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.

*The Charges and Plea Agreement*

On April 27, 2021, Nelson was charged by complaint with violating 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2).  On May 3, 2021, he was arrested after he turned himself in to the FBI in Wisconsin.  On May 6, 2021, Nelson was charged by an Information with four counts, violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On September 15, 2021, he pleaded guilty to Count Four of the Information, which charged a violation of 40 U.S.C. § 5104(e)(2)(G).  In his plea agreement, Nelson agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   <u>Statutory Penalties</u>

Nelson now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.  Nelson must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559(a)(7); U.S.S.G. §1B1.9.

### IV.   <u>Sentencing Factors Under 18 U.S.C. § 3553(a)</u>

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

### A.  The Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.  So too does the conviction this defendant now faces.  Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6 was not like picketing at the Capitol some other day, without other or with relatively few rioters present.

All defendants should be sentenced based on their individual conduct.  But this Court should note that each individual who entered the Capitol on January 6 did so under the most extreme of circumstances, and Nelson is no exception. As individuals entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law-enforcement officials and smelled chemical irritants in the air.

In that context, Nelson's crime, although a misdemeanor, was serious.   He spent considerable time outside the Capitol before entering.  Among the things he saw were people "standing on" and "cutting into the scaffolding" and police officers "shooting pepper balls" at rioters for about an hour.  Less than five minutes before he and Markofski entered the Senate Wing Door, rioters had smashed windows on either side of that entryway.  Broken glass and debris lay about the ground on both sides of the doorway.  Just 15 seconds before they entered, a rioter had

climbed through one of the broken windows.  Despite glaring evidence of a riot before he even set foot in the building, Nelson still decided to enter the besieged Capitol with Markofski at approximately 2:16 p.m.

While looking at a defendant's individual conduct, the Court should assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.  While these factors are not exhaustive or dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

What distinguishes Nelson from many other rioters who entered the Capitol is the duration of his time inside the building.  Numerous rioters charged with unlawfully entering the Capitol

spent no more than 10 minutes inside.[2]  Others spent no more than 30 minutes inside.[3]  By contrast, Nelson spent well over an hour in multiple parts of the building, including the Crypt and the Rotunda.  During this significant incursion, he clapped approvingly while the mob in the Crypt appeared to chant.  Within 10 minutes of his arrival in the Crypt, this mob overran a defensive line of officers and gained access to other parts of the Capitol.  Nelson recorded a video of rioters chanting in the building and sent it to his mother.  He admitted being in the Rotunda, which he described as a domed room, for approximately 20 minutes before police officers "started to push back and attempt to clear the rooms."  He admitted finally leaving the building at 3:30 p.m., through doors he noticed had been "smashed."

The length of Nelson's stay inside the Capitol is of particular concern to the government. Every person who entered the building contributed to beleaguering the police officers who desperately defended the building, public officials, and other Capitol employees during a violent siege.  Nelson's decision to remain inside for well over an hour—much longer than many others who entered for a relatively brief period—sets him apart from others, and exacerbated the threat posed to everyone at the Capitol on January 6.  This is an aggravating factor.

Further aggravating, despite Nelson observing all the destruction at the Capitol, rioters accosting police officers as they "pushed and shoved" to get out of the building, getting "maced,"

---

[2] See., e.g., United States v. Valerie Ehrke, 21-cr-00097 (PFF) (defendant entered Capitol for approximately one minute or less); United States v. Anna Morgan-Lloyd, 21-cr-00164 (RCL) (approximately five minutes); United States v. Sean Cordon, 21-cr-00269 (TNM) (approximately five minutes); United States v. Jonathan Sanders, 21-cr-00384 (CJN) (approximately five minutes); United States v. Kevin Cordon, 21-cr-00277 (TNM) (approximately five minutes); United States v. Leonard Gruppo, 21-cr-00391 (BAH) (approximately six minutes); United States v. Erik Torrens, 21-cr-00204 (BAH) (approximately 10 minutes); United States v. Frank J. Scavo, 21-cr-00254 (RCL) (approximately 10 minutes); United States v. Jennifer Ryan, 21-cr-00050 (CRC) (approximately 10 minutes).

[3] See, e.g., United States v. Donna Sue Bissey, 21-cr-00165 (TSC) (defendant entered Capitol for a little over 10 minutes); United States v. John Wilkerson, 21-cr-00302 (CCC) (approximately 20-25 minutes); United States v. Andrew Bennett, 21-cr-00227 (JEB) (approximately 30 minutes); United States v. David Mish, 21-cr-00112 (CJN) (approximately 30 minutes).

and seeing "shit everywhere" after he left, his texts with Markofski show neither remorse about breaching the Capitol nor even acknowledgement that what they had done was wrong. Rather, they were proud. They both believed, as Nelson texted early in the morning of January 7, 2021, they had "held the line . . . No backing down," and appeared to believe their conduct had been patriotic. Markofski replied to Nelson's text, "Yeah, brother is Patriots won't go down without a fight." Nelson responded, "Not I."

The government has no evidence that Nelson personally engaged in any violence or destruction of property. Nor did he conceal evidence from the FBI. To the contrary, he voluntarily submitted to pre-arrest and post-arrest interviews with the FBI, though he did minimize his conduct during the interviews with his statements that the "doors were open" and "the Capitol is a public building, that you can go into it almost any time," and suggesting he "got caught in the wrong place at the wrong time." In the context of what happened at the Capitol—and that he and Markofski entered through a doorway where windows had been shattered minutes before their entry—these statements are not credible, and Nelson was not a mere victim of circumstance.

The government credits Nelson with consenting to the interviews and to a search of his apartment, and for telling the FBI specifically where to recover evidence of his clothing. In addition, at an early point after he was charged, Nelson, through his counsel, expressed a desire to plead guilty. The government gives significant weight to his desire to resolve his case promptly. However, Nelson's aggravating conduct—especially his entry despite seeing evidence of a riot and destruction, the prolonged duration of his incursion, and his apparent lack of remorse shortly after the breach—weigh in favor of a short period of incarceration.

Accordingly, the nature and circumstances of the offense establish the need for 14 days of incarceration here.

### B.  The History and Characteristics of the Defendant

The FBI has confirmed that Nelson was enlisted in the Air National Guard from 2012-18, and was a Reservist from 2018-20.  *See also* Presentence Report ("PSR") PSR at 9, 12.  His service to the Nation deserves the highest praise.  But his military career also renders his participation in the Capitol riot—an event that threatened the Constitutional principles that servicemembers swear an oath to protect and defend—even more troubling.[4]  His apparent agreement with Markofski that their breach was patriotic is further disturbing and aggravating.

As set forth in the PSR, Nelson does not have a prior criminal conviction, but has a recent arrest for a traffic offense with an unknown disposition that allegedly involved driving while intoxicated.  PSR at 8.  He would likely have zero points if the Sentencing Guidelines applied to his offense of conviction. USSG § 4A1.2(c)(2).  Accordingly, he would be in Criminal History Category I. USSG §§ 4A1.1, 5A.  In addition, he has complied with all conditions of pretrial release.  PSR at 4.  These factors support a more lenient sentence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6,

---

[4]  Markofski recognized the disconcerting nature of a servicemember participating in the Capitol riot in his statement to the Court that his "actions put my oath in question" and "brought dishonor to my beloved U.S. Army National Guard."  ECF No. 44 (Ex. B).

[5] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

2021, including misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-00238 (TFH), Tr. 8/4/2021 at 3 (As Judge Hogan noted, "As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected.")  This factor also weighs in favor of incarceration for a defendant like Nelson, who disregarded the glaring signs of a violent riot outside the Capitol, entered and remained inside the building for well over an hour, and was proud he and Markofski "held the line" and did not "back[] down."

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-00188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. 7/19/2021 at 69-70.

Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 21-cr-00041 (CJN), Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See Hodgkins*, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is also a need for specific deterrence here. Despite observing a riot outside the Capitol and entering the building through a doorway with shattered windows on either side of it, Nelson still decided to enter and remain inside for well over an hour. On the early morning of January 7, he and Markofski texted each other and—despite all they had seen and done for a prolonged period outside and inside the Capitol—boasted that they had "held the line" and performed some sort of patriotic duty. In addition, while Nelson expressed some regret during his

pre-arrest and post-arrest interviews and that he would not have entered the Capitol in retrospect, his statements minimizing his conduct in his interviews with the FBI speak to his lack of genuine remorse and the need to deter him from engaging in further criminal conduct.

Both the need to deter generally and to deter Nelson specifically favor incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law-enforcement officers, to conspiracy to corruptly interfere with Congress.[6]  Each offender must be sentenced based on his or his individual circumstances, but with the backdrop of January 6 in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not become the default.[7]

Indeed, this Court has admonished that it did not "want to create the impression that probation is the automatic outcome here because it's not going to be."  *United States v. Anna Morgan-Lloyd*, 21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*,

---

[6] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *Morgan-Lloyd*, 21-cr-00164; *Ehrke*, 21-cr-00097; and *Bissey*, 21-cr-00165.  The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).  The government made no such agreement in this case.

21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

Nelson has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, and picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9.  But the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply.

For one thing, although all the other defendants listed in the table attached to this memorandum participated in the Capitol breach on January 6, 2021, many salient differences— such as how a defendant entered the Capitol, how long the defendant remained inside, the nature of any statements the defendant made (on social media or otherwise), whether the defendant destroyed evidence of participation in the breach, *etc.*—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct," but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1364-65 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); s*ee id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on codefendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law-enforcement officials, and a large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol-breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

20

As the number of sentences in the Capitol-breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

Here, in considering unwarranted disparities, the Court may consider *United States v. Donna Sue Bissey,* 21-cr-00165 (TSC).  Bissey, a 53-year-old with no prior criminal history, entered and remained in a limited part of the Capitol for under 10 minutes, a mere fraction of the time Nelson spent inside.  Like Nelson, she was aware the rioters were destroying or had destroyed property at the building, and she cooperated with the FBI after she was arrested.  In one regard, her conduct was more aggravating because she publicized her pride in breaching the Capitol by posting statements and photos of the riot on Facebook, including announcing she had "No Shame." By contrast, Nelson shared his pride in taking part in the riot in private texts to Markofski.  The Court imposed a sentence of 14 days of incarceration, 60 hours of community service, and the recommended restitution.

Another case the Court can consider is *United States v. Thomas Vinson,* 21-cr-00355 (RBW).  Vinson—an oil-company employee with four years of service in the U.S. Air Force who had two operating-a-vehicle-under-the-influence convictions from 1992 and 1996—entered the Capitol with his wife at the exact same location as Nelson, the Senate Wing Door, and around the same time, at approximately 2:18 p.m.  He left the building about 32 minutes later.  Like Nelson, he cooperated with the FBI by submitting to a voluntary interview.  Unlike Nelson, he produced some evidence to the FBI but may have concealed the worst evidence from his cellphone.  Vinson also witnessed at least two instances where rioters overwhelmed officers, one of which resulted in the brutal breach at the Rotunda Doors around 2:38 p.m.   The Court imposed a sentence of five

years of probation (without home detention), a $5,000 fine, 120 hours of community service, and $500 restitution.  Vinson's conduct is easily distinguishable from Nelson's because he spent less than half the time Nelson spent inside the Capitol.

In addition, the Court can consider *United States v. John Lolos,* 21-cr-00243 (APM). Lolos—a 48-year-old owner-operator of a security company who had a prior adjudication of guilt for threatening to kill a woman from 2010—crawled through a broken window, chanted at police, waved flags, and remained in the Capitol for approximately 43 minutes.  Lolos finally left after he saw heavily armed officers in the Capitol.  He also boasted on social media after he exited the Capitol, "They left!  We did it!"  While Nelson observed destruction at and inside the Capitol, Lolos engaged in arguably more aggravating conduct by leveraging the destruction and climbing through a broken window.  Lolos's criminal history, waving flags and chanting at police inside the Capitol, and boasting on social media are also more aggravating than some of Nelson's conduct. Yet Lolos remained inside for a little more than half the time Nelson admitted he was inside and does not have military service in his background, factors that are more aggravating for Nelson. The Court sentenced Lolos to 14 days of incarceration, the same sentence the government seeks for Nelson.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "'only one of several factors that must be weighted and balanced,'" and the degree of weight is "'firmly committed to the discretion of the sentencing judge.'"  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012) (quoting *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006)). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and

22

circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

After a review of the applicable § 3553 factors, the government believes that a 14-day term of incarceration and the agreed-upon $500 restitution is appropriate here.

**V.**     **Conclusion**

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).   As detailed above, the factors support a short sentence of incarceration. Balancing these factors, the government recommends that this Court sentence Nelson to 14 days of incarceration, $500 in restitution, and the mandatory $10 special assessment.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing a modest term of incarceration as a consequence of his behavior, while recognizing his early acceptance of responsibility and other mitigating conduct.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)
D.C. Bar No. 976587
United States Attorney's Office for the
 District of Columbia
202-252-5847
Seth.Meinero@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 6, 2021, I served a copy of the foregoing on all

parties to this matter as listed in the Court's Electronic Case Files system.

/s/ Seth Adam Meinero
SETH ADAM MEINERO
Trial Attorney (Detailee)