UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

Case No. 1:21-cr-00344-JDB-1

BRANDON NELSON,

*Defendant*.

---

**BRANDON NELSON'S SENTENCING MEMORANDUM**

Brandon Nelson participated in the riot on January 6, 2021, that led to a violent breach of the U.S. Capitol. R.8.[1] He accepted responsibility for his conduct and pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). The parties agree that the Sentencing Guidelines do not apply and that he must be sentenced based on the § 3553(a) factors alone. PSR ¶ 74; *see* USSG § 1B1.9. When assessing those factors and picking a sentence, the Court must place Mr. Nelson's conduct in context—both as to how it fits within the contours of his own life and as to how it compares to many others' misconduct during the riot that day.

As set out below, a sentence of probation is warranted. Mr. Nelson's conduct on January 6th is an aberration in his otherwise law-abiding and public-service minded life. He comes before the Court humiliated by the poor judgment he exercised and the crime he committed. On the spectrum of what occurred, though, his conduct was wrongful but limited. A term of probation appropriately places him among those defendants who participated in the riot but did not lead it, who did not act violently during it, and who have expressed remorse for their actions. And it is sufficient but not greater than necessary to effect just punishment, convey the seriousness of his offense, and deter any similar conduct. Mr. Nelson has mailed the restitution required by his plea agreement, as well as the special assessment fee, to the Clerk's Office.

[1] All citations to the record are designated with "R.___:____," with the first number indicating the CM/ECF docket entry and the second number providing a pin citation.

## I. Mr. Nelson has served his country and his community.

The sentencing factors direct this Court to consider "the history and characteristics of the defendant" when considering what sentence to choose. 18 U.S.C. § 3553(a)(1). "Th[e] elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

Mr. Nelson's history and characteristics make evident that a term of probation is appropriate, while a term of incarceration would be unnecessary and unwarranted. Mr. Nelson has no criminal history and, as multiple letters of support attest, he has led a life marked by positive contributions to everyone around him. The Court should place great weight on the words of those who have known Mr. Nelson throughout his life and who have attested to his good character.

### A. Mr. Nelson has no criminal history.

The conduct in this case is an out-of-character stain on Mr. Nelson's otherwise spotless criminal history. With the exception of the conduct in this case, Mr. Nelson has led a law-abiding life. He has no juvenile or adult criminal convictions; only traffic infractions. PSR ¶¶ 28–29, 31–32.[2]

[2] More than one year ago, Mr. Nelson received a citation for operating a vehicle while intoxicated. That charge was dismissed. PSR ¶ 33; *contra* R.49:15 (Govt. Sent'g Mem.).

**B. Mr. Nelson's day-to-day life is grounded in faith and service to others.**

Those who have known Mr. Nelson for years are best suited to speak to his character, and many have written to the Court to attest to his selflessness, work ethic, and kind-heartedness. They describe him as "a loyal, committed and dedicated individual"; "a kind and thoughtful spirit"; a "man of Integrity, high level of character and passionate in all he puts his hands on"; and "one of the most transparent, honest, and generous men that [they] know." Ex. A at 4–6 (Gerry; Ruck; Jobe); *accord id.* at 3, 7 (Farkas; Miller). As his father told the Probation Office, Mr. Nelson "has spent his adult life helping and serving people—in the Air National Guard, as a personal trainer, and working at Mendota [Mental Health Institute], which is a very difficult job." PSR ¶ 41.

Indeed, Mr. Nelson has positively affected those around him throughout his adult life, not only in the military and at Mendota, as his father mentioned, but also while he was serving as a youth group director at his church. The reviews of Mr. Nelson's character do not change depending on context. Those with whom he worked professionally have written that "Brandon cares about people and does his best to bring that out in everyone." Ex. A at 8 (Subak). And those who have known him through church speak to the fact that he has "live[d] his life constantly putting others first." *Id.* at 5 (Jobe).

Testaments to Mr. Nelson's good character also come in detailed accounts of his good deeds. He was a stalwart presence at his church in La Crosse, where parishioners watched him "stay multiple hours after church to just hang out with the youth of all ages," and he took pride in providing a "positive influence" on those young people to help them "make wise choices." *See* Ex. A at 4–5 (Jobe; Gerry). Mr. Nelson also is the first

to lend a hand "[i]f ever there is a time where money is tight or someone needed help." *Id.* at 6 (Ruck). Indeed, he is the person who stopped to make sure that a stranger who was a victim of a bar fight received proper medical attention, taking "off his shirt to apply [] pressure to the back of the man's head to stop the bleeding" and making certain "someone called 911." *Id.* And he's also the person who donated his time to make sure that a young lady without means to pay him for weight training sessions received free sessions so she could succeed on her softball team. *See id.* at 7 (Miller). At Mendota, "he has picked up coworkers['] mandated shifts so that they could go home to their families." *Id.* at 2 (Cook). And, as one of his co-workers recalls, when she was "going through hard times," it was Mr. Nelson who "reached out" and "checked on me to see how I was doing and how I was managing my struggles. . . . [H]e has been there for me like no one else has." *Id.* at 1 (Brockett).

**C. Mr. Nelson proudly served his country for six years and now provides a public service to his community.**

Mr. Nelson has dedicated the majority of his adult life to public service. He served in the Wisconsin Air National Guard for six years, from January 2012 to January 2018. PSR ¶ 56; Ex. B at 1. He was promoted to the rank of Senior Airman and deployed for five months to South Korea. PSR ¶ 56. Mr. Nelson's military service has greatly influenced his life. In his own words, as a result of his time in the military, he "learned discipline, selflessness and toughness that has carried into every other aspect of [his] life." Ex. B at 1. This prosecution is particularly painful for him, as it means he will have to live

with the public shame and guilt of having threatened American democracy after having represented America in uniform.

Today, Mr. Nelson's job provides a valuable and important service to his community. As mentioned above, he works full-time as a psychiatric technician at Mendota Mental Health Institute, which "primarily serves men in need of court-ordered mental health competency evaluations, treatment to competency services, and treatment as the result of being found not guilty of criminal activity by reason of mental illness." *See Mendota Mental Health Institute*, WIS. DEP'T OF HEALTH SERVS., https://tinyurl.com/2vv2fdtk (last visited Dec. 5, 2021); *see* PSR ¶ 52. Among many other tasks at Mendota, Mr. Nelson is responsible for providing one-on-one care to patients, monitoring patients to ensure no patient engages in self-harm, feeding those who are unable to feed themselves, and physically intervening to prevent altercations. Ex. B at 1.

Mr. Nelson works exceptionally hard at Mendota. Despite the challenging and difficult nature of his work, he frequently puts in more than a standard 40-hour workweek. *See* Ex. A at 3 (Farkas); Ex. B at 2. He often has to "work with a variety of extremely difficult" patients, but, as his co-workers observe, he always engages "with outstanding professionalism and care." Ex. A at 1 (Brockett); *see also* Ex. B at 1. The service he provides is marked by "compassion, respect, and appropriate attention." Ex. A at 1 (Brockett). On a personal level, he knows that he is providing a service to those at Mendota and feels a religious calling to help. In his words: "I work the job that I do because of my faith, and believe I have to use my God given ability to handle caring for people even when it is not easy." Ex. B. at 1.

**D. Mr. Nelson has expressed remorse for his role in the riot on January 6th.**

Undoubtedly, Mr. Nelson's participation in breaching the Capitol is inconsistent with the person that his friends and family always have known. Mr. Nelson recognizes this and, for that reason, quickly accepted responsibility by pleading guilty. Consistent with his good character and reputation, he has expressed immense remorse when speaking to those closest to him about what happened on January 6th. *See, e.g.*, Ex. A at 2–3 (Cook; Farkas). And they are confident that he will not repeat his misconduct from this case. Instead, this prosecution has served as "a call to action for Mr. Nelson and he will respond by becoming a better man than before" because "[h]e receives his mistakes as lessons and learns from them." *Id.* at 1, 5 (Brockett; Jobe); *see also id.* at 4 (Gerry) ("Brandon is a good man, honest, noble and kind. He is not a person that is rebellious, but instead a man that honors authority and believes the best in people."). Mr. Nelson's own father, who served in the Wisconsin Department of Corrections for many years, reports that Mr. Nelson "*always learns from his mistakes and is not one to keep doing the wrong thing*"; he is "*very receptive to corrective behavior*," and "he has been shaken by this offense." PSR ¶ 41 (emphases added).

Mr. Nelson's own letter to the Court emphasizes his remorse and shame for his misconduct. He recognizes the harm that he has caused, not only in the immediacy of the riot but in its long-term reverberations: "Nobody should have gotten hurt that day and that was not the case. . . . People should not have to be fearful of fellow citizens and people they are around. I'm sorry and ashamed that by being a part of this I have caused many people to feel that way." Ex. B at 1. He is haunted by his role in the riot and has "had

many sleepless nights, thinking of being a part of this event and how I should have exercised different judgment, and not have made such a poor decision." *Id.* at 2. He already has paid the restitution and special assessment fee detailed in his plea agreement.

## II. Mr. Nelson played an inexcusable but limited role in the Capitol breach.

The sentencing factors ask this Court to consider not simply the charges, but "the nature and circumstances of the offense" when selecting a sentence. 18 U.S.C. § 3553(a)(1). The Government has urged this Court to place a defendant's conduct on a "spectrum" of misconduct from that day through reference to nine "critical factors." R.49:12. Each factor weighs in favor of leniency as to Mr. Nelson, because it highlights the limited nature of his role at the Capitol, his acceptance of responsibility and remorse, and his full cooperation with law enforcement since that day:

| Government's Factor | Mr. Nelson's Conduct |
|---|---|
| Whether, when, and how the defendant entered the Capitol building | Mr. Nelson entered through the Senate Wing Door after others forced entry. R.41:2–3. |
| Whether the defendant engaged in any violence or incited violence | Mr. Nelson did not engage in any acts of violence and did not incite any violence. R.41:4. |
| Whether the defendant engaged in any acts of destruction | Mr. Nelson did not engage in any acts of destruction. R.41:4. |
| The defendant's reaction to acts of violence or destruction | Mr. Nelson sent his mother a video of others chanting "Stop the Steal" and texted her that others had caused damage to the building and that he had gotten "maced." R.41:3–4. |

| | |
|---|---|
| Whether during or after the riot, the defendant destroyed evidence | Mr. Nelson twice spoke with the FBI voluntarily, immediately admitted that he entered the Capitol, and described in detail what he was wearing so that the police could identify him more easily on video surveillance footage. R.1-1:2. He also allowed law enforcement to review his social media accounts. PSR ¶ 73. And he consented to a search of his home. |
| The length of the defendant's time inside the building, and exactly where the defendant traveled | Mr. Nelson was inside the Capitol for approximately 90 minutes. *See* R.41:3–4. To the best of his recollection, he walked through the building and stayed in main hallways; he did not enter any representative's office. |
| The defendant's statements in person or on social media | In addition to the text messages noted above, in the early hours of January 7, 2021, Mr. Nelson and Abram Markofski exchanged text messages that they had "held the line" and not "back[ed] down." R.41:4. For the last year, Mr. Nelson's social media presence largely has focused on retweeting posts about cryptocurrency. PSR ¶ 43. |
| Whether the defendant cooperated with, or ignored, law enforcement | Mr. Nelson cooperated with law enforcement. |
| Whether the defendant otherwise exhibited evidence of remorse of contrition | Mr. Nelson accepted responsibility by pleading guilty and has expressed remorse in conversations with friends and colleagues, as well as his letter to the Court. *See* Exs. A & B. |

In sum, Mr. Nelson played the role of wrongful spectator on January 6th. He traveled to the Capitol, went inside the building, filmed the breach, texted his mother, and then left. R.41:3–4. He did not act violently or harm any property. *Id.* But he knew better than to be in the Capitol on January 6th. And, with the benefit of hindsight and reflection, he has taken full responsibility for his actions and expressed remorse; not only by pleading guilty quickly but also in conversations with close friends and in his letter to

the Court. His friends and family believe that he "is of full understanding of his mistake." Ex. A at 6 (Ruck); *accord* PSR ¶ 41. And his letter conveys the same. *See* Ex. B at 1–2.

That Mr. Nelson's role was limited does not excuse his conduct, though; nor does it (or could it) downplay the violence of what happened. As the Government has emphasized in other cases (and surely will here), it takes more than one person to create a riot. Mr. Nelson recognizes that he participated in action that undermined American democracy, and he has taken responsibility for his misconduct and cooperated fully with law enforcement. At the same time, his actions sit at the far end of the spectrum of misconduct committed by individuals that day. In turn, as discussed at greater length below, his sentence should be commensurately on the lenient end of the spectrum of sentences imposed on Capitol-breach defendants.

## III. A sentence of probation is sufficient but not greater than necessary to serve all the purposes of sentencing under § 3553(a).

Taking into account who Mr. Nelson is as a person and his limited role in the Capitol breach, a sentence of probation is the appropriate one in his case. That sentence speaks to the seriousness of Mr. Nelson's offense, serves the interest in both general and specific deterrence, and avoids unwarranted disparities between himself and other Capitol-breach defendants. He already has mailed the restitution he owes under the terms of his plea agreement, as well as the special assessment fee, to the Clerk's Office.

**A. A sentence of probation reflects the seriousness of Mr. Nelson's offense and serves the interests in just punishment and deterrence.**

Undoubtedly, the nation is watching the sentences that this Court hands out to each defendant who participated in the January 6th riot. But no one would think that a sentence of probation is not serious. Indeed, such a sentence *is* serious: a person sentenced to probation becomes subject to numerous conditions "that substantially restrict [his] liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007). In addition to several mandatory conditions, the court is free to set such other conditions as it deems appropriate. 18 U.S.C. § 3563(b)(22). And if he violates any condition imposed, he can be prosecuted. 18 U.S.C. § 3565; Fed. R. Crim. P. 32.1.

The fact that Mr. Nelson is being prosecuted for his participation in the January 6th breach of the Capitol itself serves the interest in deterrence. This public prosecution places an indelible mark on his record and has showered him with negative attention from the press.[3] He is "shaken" and embarrassed. *See* PSR ¶ 41; Ex. B. The guilt he feels for harming his country cannot be overstated; it, standing alone, guards against any risk of recidivism. *See* Ex. B at 1; *see also, e.g.*, June P. Tangney et al., *Two Faces of Shame: Understanding Shame and Guilt in the Prediction of Jail Inmates' Recidivism*, 25 PSYCHOL. SCI. 799 (2014), https://tinyurl.com/y2sy5zdd ("Inmates prone to feelings of guilt about

[3] *See, e.g.*, Eric Trevlan, *Madison-area- man pleads guilty to US Capitol riot-related charge*, WIS. STATE J., Sept. 16, 2021, https://tinyurl.com/43yxasxv; *6 Wisconsin men were charged in the Jan. 6 Capitol insurrection in Washington, D.C. Here's the latest on their cases*, MILWAUKEE J. SENTINEL, Sept. 2, 2021 (updated Oct. 19, 2021), https://tinyurl.com/7k382vaj; Jaymes Langrehr & Gabrielle Bachara, *Dane Co., La Crosse Co. men charged for entering U.S. capitol during January 6th riot*, CHANNEL3000+, May 3, 2021, https://tinyurl.com/f7hxtjxx.

specific behaviors are less likely to subsequently reoffend than their less guilt-prone peers.”). There is little risk that Mr. Nelson will engage in similar behavior again. In addition to his friends’ and family’s confidence that he has learned from his mistake, Mr. Nelson represents that he has “cut out any inkling of toxic politics” from his life and is “focusing on building [his] future and working as hard as [he] possibly can to alter the direction of [his] life to continue serving others.” Ex. B at 2; *see supra* at 6 (summarizing character letters stating that Mr. Nelson is unlikely to recidivate). And anyone who was aware or learned of Mr. Nelson’s case and saw that he received a sentence of probation would be deterred from engaging in the same conduct. *See, e.g.*, *United States v. Alatsas*, No. 06-CR-473, 2008 WL 238559, at *2 (E.D.N.Y. Jan. 16, 2008) (sentence of three years’ probation plus restitution served general and specific deterrence interests, in part due to “the shame created by the felony convictions”).

**B. A sentence of probation aligns with sentences imposed on other Capitol-breach defendants for violating 40 U.S.C. § 5104(e)(2)(G).**

To date, dozens of Capitol-breach defendants have been sentenced for violations of 40 U.S.C. § 5104(e)(2)(G). In light of the unique circumstances of the Capitol breach and the number of prosecutions it generated, this Court should look to the sentences imposed in those cases to avoid unwarranted sentencing disparities. *See* R.49:20 (Govt. Sent’g Mem.) (“the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity”).

**1. Mr. Nelson is most similarly situated to those who have received sentences of probation, not incarceration.**

Mr. Nelson is most similarly situated to those defendants who were sentenced to terms of probation. A few cases in which other Capitol-breach defendants pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G) (like Mr. Nelson) provide helpful points of comparison to place Mr. Nelson's own conduct in context.

First, for example, the Court should consider the case against Sean Cordon, who received a sentence of two months' probation and a $4,000 fine. *See* Judgment at 2, 5, *United States v. Cordon*, No. 21-cr-269-TNM (D.D.C.), R.37. Mr. Cordon had traveled to the District of Columbia to attend former-President Trump's rally, wearing "light body armour and carr[ying] a gas mask" (and possibly also bear spray); then followed the crowd to the Capitol, climbed through a broken window to enter the building, took a video while inside, and left through a window. *See* Stmt. of Offense at 3–4 & Govt. Sent'g Mem. at 1–2 & n.1, *Cordon*, R.24 & R.31. He did not engage in any violence or directly confront law enforcement, and he acknowledged that his behavior was a mistake. Govt. Sent'g Mem. at 12, 16, *Cordon*, R.31.

As a second example, the Court should consider Danielle Doyle, who received a sentence of two months' probation and a $3,000 fine. *See* Judgment at 2, 4, *United States v. Doyle*, No. 21-cr-324-TNM (D.D.C.), R.34. Ms. Doyle entered the Capitol through a broken window and toured "numerous areas" of the building (on multiple levels) over the course of about 25 minutes, chanted or yelled at law enforcement, photographed the destruction inside and outside the Capitol, and then left. *See* Stmt. of Offense at 3 & Govt. Sent'g Mem.

at 1–4, 8, *Doyle*, R.24 & R.27. She wasn't violent, she didn't damage any property, and she expressed remorse over what occurred. *See* Govt. Sent'g Mem. at 5, *Doyle*, R.27.

As a last example, this Court should consider the sentence imposed on Lori Vinson, who was sentenced to five years' probation and a fine of $5,000. *See* Judgment at 2, 4, *United States v. Vinson*, No. 21-cr-355-RBW (D.D.C.), R.55. Ms. Vinson entered the Capitol at 2:18 p.m. (roughly two minutes after Mr. Nelson), made a video of her time inside the building on her cell phone, was in the building for about 30 minutes, and told local news outlets a few days later "that she believed her actions were 'justified' and that she would 'do this all over again tomorrow.'" *See* Stmt. of Offense at 3–4 & Govt. Sent'g Mem. at 1–2, 8, *Vinson*, R.31 & R.43. In the weeks that followed, she doubled-down on that position and made similar statements on Facebook and in other television interviews, as well as told multiple people through direct messages that "she would 'do it again.'" *See* Govt. Sent'g Mem. at 2, 9–11, 16–17, *Vinson*, R.43.

Mr. Nelson's actions fall within the ambit of this group. Like each of these individuals, Mr. Nelson wrongfully entered the Capitol, toured the building, and then left. He did not engage in any violence or damage any property. He stayed in the building for a lengthy period of time (like Ms. Doyle and Ms. Vinson), and took a video inside the building (like Mr. Cordon and Ms. Vinson; and akin to Ms. Doyle, who photographed the damage). At the same time, his actions were less offensive than those of all three individuals. He did not climb through a broken window (like Ms. Doyle and Mr. Cordon), he did not arrive prepared for violence (like Mr. Cordon), and he did not repeatedly tell news outlets that he would "do this all over again tomorrow" (like

Ms. Vinson). In defining the spectrum of misconduct on January 6th and finding Mr. Nelson's place along it, these cases help place Mr. Nelson in the group of individuals who received sentences of probation.

**2. Mr. Nelson is not similarly situated to those defendants who have received sentences that include incarceration.**

It's easy to further confirm that a probation-only sentence is warranted by comparing Mr. Nelson's conduct to that of defendants who pleaded guilty to the same offense and received terms of incarceration. Mr. Nelson is not similarly situated to those individuals, because their cases involved aggravating factors, including violence, that are absent from his case. Again, a few examples make the point.

First, Mr. Nelson is easy to differentiate from someone like John Lolos, who was sentenced to 14 days' incarceration. *See* Judgment at 2, *United States v. Lolos*, No. 21-cr-243-APM (D.D.C.), R.38. Mr. Lolos previously had been "convicted of criminal harassment for loudly threatening to kill a woman, inside her office, and making repeated punching motions at her face," for which he had received a sentence of probation. *See* Govt. Sent'g Mem. at 1–2, 15, *Lolos*, R.32. He breached the Capitol by climbing in through a broken window, with his face partially obscured by a mask; celebrated his participation in the "battle" over the certification of the vote, including "triumphantly" waving a Trump 2020 flag and screaming "They left! We did it!"; and left only when he was confronted by armed officers. *See id.* at 3, 6–10, 14–15; Stmt. of Offense at 3–4, *Lolos*, R.25. On the flight home, days later, he repeatedly chanted "Trump 2020!" and was so unruly that he had to be removed from the plane. Govt. Sent'g Mem. at 3, 12, 15, *Lolos*, R.32.

Even further afield from Mr. Nelson is Bradley Rukstales, who was sentenced to 30 days' incarceration. *See* Judgment at 2, *United States v. Rukstales*, No. 21-cr-41-CJN (D.D.C.), R.140. While inside the Capitol, Mr. Rukstales "brazenly engaged in disorderly conduct" when he threw a chair at retreating police officers; disobeyed orders to leave the building; was arrested inside the Capitol; and then refused to comply, requiring three officers to effectuate his arrest. *See* Stmt. of Offense at 3–4 & Govt. Sent'g Mem. at 4, 7–12, 18, 20, *Rukstales*, R.90 & R.130.

As a third example, Mr. Nelson also is easy to distinguish from a defendant like Robert Reeder, who was sentenced to three months' incarceration. *See* Judgment at 2, *United States v. Reeder*, No. 21-cr-166-TFH (D.D.C.), R.41. Mr. Reeder entered the Capitol *twice*, "recorded an assault on a Capitol Police Officer," told that officer "You need to retreat!," and bragged about being "gassed several times inside the Capitol" and "do[ing] . . . battle with the Police inside." Stmt. of Offense at 3–4, *Reeder*, R.19.[4] He also videotaped himself inside the Capitol Rotunda, others "appearing to attempt to breach the doors [to the Senate chamber]," and "the mob chanting 'Hang Mike Pence.'" Govt. Sent'g Mem. at 4, 8, *Reeder*, R.26.

Mr. Nelson's role in the Capitol breach, while deplorable, is distinct from that of Mr. Lolos, Mr. Rukstales, or Mr. Reeder. Unlike all three examples, Mr. Nelson did not resist orders, let alone assault a police office. He does not have a criminal history (unlike

[4] *See also* Jordan Fisher et al., *"I'm radioactive": Maryland man sentenced to 3 months in jail says Capitol riot has ruined his life*, WUSA9 (Oct. 8, 2021), https://tinyurl.com/tpxz77rb (reporting that Reeder's first sentencing hearing was postponed after a video surfaced "showing him grabbing and pulling a police officer onto the ground on January 6").

Mr. Lolos). He did not tout having done "battle" with law enforcement or brag about being pepper sprayed (like Mr. Reeder). He did not engage in violence (like Mr. Rukstales) and he did not record violence against the police (like Mr. Reeder). Mr. Nelson entered the Capitol unlawfully, but he traveled home quietly (unlike Mr. Lolos). Although convicted of the same misdemeanor as these defendants, the details of Mr. Nelson's offense are substantively different in kind. *See also United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021) ("[T]hose who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."). It follows that his conduct warrants different punishment.

**C. The interest in public safety is best served by a sentence of probation, not home detention, because Mr. Nelson provides an important service to the community through his work at Mendota Mental Health Institute.**

The sentencing factors also require the Court to consider "the kinds of sentences available" as part of its analysis. 18 U.S.C. § 3553(a)(3). While some Capitol-breach defendants have been sentenced to terms of home confinement, a term of home confinement would work *against* the public interest in this case. Mr. Nelson provides essential services to those in need of assistance and care at Mendota Mental Health Institute. He frequently works overtime. *See* Ex. B at 2 (noting "80+ hour" weeks). A period of home detention would disserve the patients he supports at Mendota and disserve the community by leaving Mendota with one less full-time employee.

## CONCLUSION

Mr. Nelson comes before the Court ashamed by the role he played in the breach of the U.S. Capitol on January 6, 2021. As his own letter to the Court articulates, he has spent the last year reflecting on the harm he caused our country, its laws, and its citizens' faith in one another. Without downplaying that harm, he respectfully submits that a sentence of probation is appropriate in his case.

Dated at Madison, Wisconsin this 6th day of December, 2021.

Respectfully submitted,

Brandon Nelson, Defendant

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger (D.D.C. Bar No. D00483)
Joseph A. Bugni
FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
jessica_ettinger@fd.org
joseph_bugni@fd.org

**CERTIFICATE OF SERVICE**

On this 6th day of December 2021, I filed the foregoing document electronically filed with the Clerk of the Court for the United States District Court for the District of Columbia by using the Court's CM/ECF system, which will provide electronic service on all counsel of record.

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger