```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  Nos. 21-344-1 and
vs.                                )  21-344-2
                                   )
BRANDON NELSON and                 )  December 10, 2021
ABRAM MARKOFSKI,                   )  1:06 p.m.
                Defendants.        )  Washington, D.C.
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE JOHN D. BATES,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**
*(Parties appearing via videoconference.)*

**APPEARANCES:**

FOR THE UNITED STATES: SETH ADAM MEINERO
                       DOJ-USAO
                       555 4th Street, NW
                       Washington, DC 20904
                       (202) 252-5847
                       Email: seth.meinero@usdoj.gov


FOR DEFENDANT NELSON: JESSICA ARDEN ETTINGER
                      Federal Defender Services of Wisconsin
                      22 East Mifflin Street
                      Madison, WI 53703
                      (608) 260-9900
                      Email: jessica_ettinger@fd.org


FOR DEFENDANT MARKOFSKI:
                       JONAS BEDNAREK
                       33 East Main Street
                       Madison, WI 53703
                       (608) 257-0945
                       Email: jbednarek@hurleyburish.com


ALSO PRESENT:          CRYSTAL LUSTIG, U.S. Probation

Court Reporter:        Elizabeth Saint-Loth, RPR, FCRR
                       Official Court Reporter


*This hearing was held via videoconference and*
*telephonically and is, therefore, subject to the limitations*
*associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                         **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Your Honor, we have

3     Criminal Action 21-344-1 and -2, United States of America

4     versus Brandon Nelson and Abram Markofski.

5              We have Mr. Seth Meinero representing the

6     government.  I hope I said your last name right, sir.  And

7     we have Ms. Jessica Ettinger representing Mr. Nelson, and

8     Mr. Jonas Bednarek representing Mr. Markofski; all parties

9     appearing by video.  And we also have Ms. Crystal Lustig

10    representing probation, and she, too, as well is appearing

11    by video.

12             THE COURT:  All right.  Good afternoon to

13    everyone, at least it is afternoon here.

14             We are here today for sentencing in these two

15    matters -- one case, but two defendants.  My intent is to

16    proceed with most of this with both defendants being treated

17    together, but then to separate it out when I get to the

18    point of individualized sentencing.

19             Any objection to that from the defendants?

20             MR. BEDNAREK:  No objection from Mr. Markofski.

21    Thank you.

22             MS. ETTINGER:  No objection from Mr. Nelson.

23    Thank you.

24             THE COURT:  And I assume no objection from the

25    government as well, Mr. Meinero.

```
 1                 MR. MEINERO:  No, sir.  No objection.

 2                 THE COURT:  And as well -- these are sentencings

 3      on misdemeanor charges.  Count 4 of the information to which

 4      each of the defendants has pled is a misdemeanor; and,

 5      therefore, we can proceed by videoconference with the

 6      consent of the defendants.  And it's not really covered by

 7      the CARES Act, which is really addressed to felony

 8      sentencings; so I have to make sure that I have the consent

 9      of each defendant to proceed by videoconference with this

10      sentencing.

11                 So let's start with Mr. Nelson.

12                 Ms. Ettinger, do I have consent that this

13      proceeding can go forward by videoconference?

14                 MS. ETTINGER:  Yes, Your Honor.

15                 THE COURT:  And on behalf of Mr. Markofski,

16      Mr. Bednarek, do I have consent to proceed by

17      videoconference?

18                 MR. BEDNAREK:  Yes.  Thank you.

19                 THE COURT:  All right.  And we will do so.

20                 Now, I guess the first question I will ask of each

21      defendant through counsel is whether you have received the

22      presentence report as it's been revised -- I don't think

23      there have been really any revisions -- and whether there

24      are any remaining issues in dispute with respect to it.

25                 Ms. Ettinger?
```

1          MS. ETTINGER:  No there are no -- no further

2     issues, Your Honor.

3          THE COURT:  Mr. Bednarek.

4          MR. BEDNAREK:  Yes.  We have received the

5     documents referenced, and we have no additional corrections.

6     Thank you.

7          THE COURT:  All right.  And the same question to

8     the government.

9          Mr. Meinero, have you received, reviewed, and are

10    there any remaining issues with respect to the presentence

11    report?

12         MR. MEINERO:  Not from the government, Your Honor.

13         THE COURT:  All right.  Under Federal Rule of

14    Criminal Procedure 32(i)(3)(A), I will accept the

15    presentence report as findings of fact on issues not in

16    dispute.

17         We are here because each defendant has pled guilty

18    to Count 4 of the information in this case charging the

19    offense of parading, demonstrating, or picketing in a

20    Capitol Building, in violation of Title 40 of the United

21    States Code, Section 5104(e)(2)(G); and that's a Class B

22    misdemeanor.  And this, of course, relates to the events

23    that took place on January 6th, 2021, in and around the

24    United States Capitol.

25         The sentencing guidelines do not apply because

1     this is a misdemeanor to which each defendant has pled.  So

2     I will be undertaking a review and sentencing decision based

3     on all of the relevant factors under Section 3553(a) of

4     Title 18 of the U.S. Code; but the sentencing guidelines do

5     not apply and will not obviously be considered.

6            I won't take account of any criminal history

7     that's relevant here; but with respect to each of the

8     defendants, there is no relevant criminal history.  Neither

9     Mr. Nelson nor Mr. Markofski has any prior criminal history,

10    with the exception of one speeding violation; but that's not

11    relevant to my consideration and weighing of prior criminal

12    history here.

13           So, with that, I think I actually can turn right

14    to counsel.  And then if the defendants themselves wish to

15    say anything -- to them as well; I will hear from you.

16           We'll start with Ms. Ettinger on behalf of

17    Mr. Nelson, and then I will hear from Mr. Nelson.  And then

18    we'll go to Mr. Bednarek on behalf of Mr. Markofski and, if

19    he wishes to say anything, I will hear from Mr. Markofski.

20           So, Ms. Ettinger, you are up first.

21           MS. ETTINGER:  Thank you, Your Honor.

22           THE COURT:  Actually, let me -- lest I forget, I

23    guess I will hear first from the government, not from

24    defense counsel.  So, Mr. Meinero, let's hear first from you

25    on both cases.

1           MR. MEINERO:  Very well, sir.

2           Brandon Nelson and Abram Markofski committed one

3    of the longest breaches, perhaps the longest breach of

4    anyone sentenced so far for breaching the United States

5    Capitol, on January 6, 2021.

6           I will start with a general statement, Your Honor.

7           The attack on -- the riot at the Capitol that day

8    was a singularly shameful event in our nation's history, and

9    repugnant to our republic.  Every person who participated,

10   including those who committed only misdemeanors, like

11   Mr. Nelson and Mr. Markofski, bears responsibility for that

12   attack on our democratic values.

13          But focusing on their individual conduct as we

14   must, Mr. Nelson and Mr. Markofski traveled from Wisconsin

15   to attend the rally of the former President held earlier

16   that day; they walked to the Capitol together.  They knew

17   before they even set foot in the building that a riot was

18   occurring outside according to Mr. Nelson, who gave a more

19   extensive account of what they observed before entering the

20   building.  They spent a significant time, perhaps as much as

21   an hour, outside the building before they entered.

22          Mr. Nelson told the FBI that he observed people

23   standing on, cutting into, scaffolding outside the building,

24   and police shooting pepper balls.

25          Mr. Nelson and Mr. Markofski entered at the Senate

1    wing door, which is in the northwest part of the Capitol, at

2    approximately 2:16 p.m.  Just about four or five minutes

3    before they entered, rioters breached that entryway by

4    smashing the windows on either side of the doorway, climbing

5    into that space, kicking open the doors, and smashing a

6    window pane on those doors.  After that, rioters began

7    cascading inside that entryway through the doorway and

8    through both of the smashed windows.

9         And just about 15 seconds before Mr. Nelson and

10   Mr. Markofski entered, Capitol surveillance video captured a

11   rioter climbing through or into one of the smashed windows

12   on the north side of that entryway.  When Mr. Nelson and

13   Mr. Markofski crossed the threshold, debris, shattered

14   glass, lay about the floor underneath those smashed windows;

15   but, despite that, they continued further into the Capitol.

16        They proceeded to the area known as the Capitol

17   crypt as a mob there converged on a thin line of police

18   officers defending that space; and as that mob chanted,

19   Mr. Nelson and Mr. Markofski held up their phones to record

20   what was happening.  They were enthusiastic participants.

21        During the chanting, Mr. Markofski nodded his head

22   affirmatively and pumped his fist for a short time; and

23   Mr. Nelson clapped along for a few seconds while that

24   occurred.  Just a little over five minutes after the

25   defendants appeared in the crypt, the mob was able to

1  overwhelm the officers, breach the defensive line, and gain

2  access to other parts of the Capitol; but, despite that, the

3  defendants continued further.

4          At about 2:49 p.m., over a half hour after they

5  had entered the building, Mr. Markofski sent a text to a

6  friend boasting from inside the building:  We stormed the

7  Capitol and shut it down.  He also admitted that at some

8  point, although it's unclear exactly when, a police officer

9  told him he should leave the building for his safety.

10          The defendants entered the Rotunda for another

11  significant period, and remained there until police officers

12  were finally able to marshal the resources they needed to

13  drive rioters out of that space.

14          Mr. Nelson acknowledged that he saw rioters

15  accosting police officers, and that officers started to push

16  back in attempt to clear the rooms; and the rioters pushed

17  and shoved to get out of the building.

18          Mr. Nelson and Mr. Markofski then exited the

19  Capitol at the Rotunda doors adjacent to the Rotunda; and

20  Mr. Nelson observed, and video surveillance confirmed, that

21  the window panes on those doors were also smashed.  They

22  left out of the Rotunda doors at approximately 3:41 p.m.

23          Around that time, at approximately 3:40 p.m., a

24  minute before, around that same time, Mr. Nelson texted his

25  mother that he had been "maced," and that there was "shit

1    everywhere."

2          All in all, the defendants spent well over an

3    hour, if we rely on the geolocation data from

4    Mr. Markofski's phone; about 84 to 85 minutes inside the

5    Capitol during the riot.  This is a highly aggravating

6    factor, Your Honor.

7          Each minute a rioter was inside the Capitol, the

8    police had to spend energy addressing the threat and, at

9    times, a violent threat posed to members of Congress, their

10   staff, other police officers, other employees at the

11   Capitol, and even other rioters who were in the building.

12   Each minute was another minute beleaguering law enforcement

13   officers.  Further, each minute was a minute our democratic

14   process was delayed; and that delay caused doubt and dismay

15   among the American people that it would resume -- and there

16   was concern that it would resume at all that day.

17         To give a frame of reference for how unusual the

18   incursion -- the duration of the incursion of these

19   defendants was, I have reviewed the sentencing memo

20   submitted by the government for nearly all of the -- and I

21   have counted 49 Capitol riot defendants sentenced before

22   they're being sentenced today.

23         There were about four defendants whom I could not

24   tell how long they were in the building.  But a little over

25   a quarter of those 49 defendants, Your Honor, they were

1   inside between one and ten minutes.  Nearly half of the 49

2   were inside between 11 and 30 minutes.

3            So if we take that first group and that second

4   group, about three-quarters of these 49 defendants were

5   inside of the Capitol for 30 minutes or less.

6            Another smaller group, about 10 percent, were

7   inside between 31 to 59 minutes; and then another two were

8   in the Capitol for about 60 minutes, perhaps longer than 60

9   minutes.  But I have not been able to identify another

10  defendant who was in the Capitol for over 80 minutes, as

11  these defendants were.

12           After January 6th or after --

13           THE COURT:  Mr. Meinero --

14           MR. MEINERO:  Yes.

15           THE COURT:  -- why is the length of time inside of

16  the building of such importance in sentencing?

17           MR. MEINERO:  As I said, Your Honor, it was more

18  time beleaguering the officers who had to defend the

19  building; it was more time contributing to the delay and the

20  certification of the Electoral College vote.  It added to

21  the aggravation caused by everyone inside that building, and

22  even the American people, because of the delay that caused.

23  So --

24           THE COURT:  But there is a list of nine factors

25  that has been developed; where has that been developed from?

1          MR. MEINERO:  That factor in the list of nine

2     would go to the first factor when --

3          THE COURT:  No.  You are not understanding my

4     question.

5          MR. MEINERO:  I'm sorry.

6          THE COURT:  Where does that list of those factors

7     come from?

8          MR. MEINERO:  Oh.  That is a list that our office

9     developed, having a bird's-eye view of these cases; and that

10    is a list that our office developed out of --

11         THE COURT:  And the length of time inside the

12    building is one of those nine items.  Do any of the other

13    nine factors support a stronger sentencing here?

14         If I have to look at those nine factors -- if, in

15    your office's view, I should look at those nine factors, is

16    it only one out of nine that actually supports a more

17    serious sentence here?

18         MR. MEINERO:  It's the sixth factor we list, the

19    length of the defendant's time and the area the defendant

20    traveled.

21         THE COURT:  It is number six; that's right.

22         MR. MEINERO:  Right.  It also goes -- well, the

23    entry is, sort of, a separate issue that we listed, number

24    one, how they entered; but the length is one of the nine

25    factors, Your Honor.

1      THE COURT:  But let me repeat my question and see

2   if you have an answer for it.

3      MR. MEINERO:  Sure.

4      THE COURT:  Is it only that factor, the length,

5   which is factor number six -- is that the only one of the

6   nine factors that actually supports a longer sentence here

7   or a more serious sentence?

8      MR. MEINERO:  I think -- I think in that list it

9   is the one factor that applies to --

10      THE COURT:  So the other eight factors generally

11   would be either neutral or supportive of the defendant's

12   request for a lesser sentence?

13      MR. MEINERO:  No.  No.  Certainly the first

14   factor, when and how they entered, because they entered

15   after spending about an hour outside the Capitol --

16      THE COURT:  So what?

17      MR. MEINERO:  -- having had an opportunity --

18      THE COURT:  So what?

19      MR. MEINERO:  So they would have had knowledge

20   about the situation that was brewing at the Capitol; they

21   knew a riot was occurring but went in anyway.

22      They also entered through an entryway that had

23   been breached violently, with smashed windows and a breached

24   doorway, so --

25      THE COURT:  But you can make the argument --

1    that's why I say some of them are neutral.  You can make the

2    argument on that factor, when and how the defendants entered

3    the Capitol Building, that this was a nonviolent entry.

4    There was no breaching of a police line; they did not break

5    windows or otherwise breach and open doors or windows.

6            They simply walked in after others had done that.

7    So why isn't that a factor that actually is either neutral

8    or in their favor?

9            MR. MEINERO:  I don't think it's neutral, Your

10   Honor, because there is still knowledge of the violent

11   nature of the breach, and they went in anyway.  And I --

12           THE COURT:  So give me an example --

13           MR. MEINERO:  -- believe you are correct, there is

14   no evidence --

15           THE COURT:  Give me an example, Mr. Meinero, of

16   someone as for whom that factor -- when and how they entered

17   the Capitol Building -- would be neutral or favor them.  It

18   seems to me you are saying that anyone who went in, that's a

19   strike against them.

20           MR. MEINERO:  Well, it's whether, when, and how

21   they entered.  They entered at a relatively early point.

22           I don't know if I would call them part of the

23   "first wave," but very close to this first wave; very early

24   on they were inside the building.

25           THE COURT:  But now you're being inconsistent.

1          Now you're being inconsistent, Mr. Meinero,

2    because a moment ago you said that it weighs against them

3    because they were there for a long time outside observing

4    what was happening; and now you are saying that they were

5    one of the first to enter.

6          Those seem to be really inconsistent.

7          MR. MEINERO:  I don't think so, Your Honor,

8    because the situation was brewing at the Capitol for quite a

9    while before individuals actually breached the building

10   itself.  There was all sort of chaotic activity that was

11   going on outside the building --

12          THE COURT:  I am aware of that.

13          MR. MEINERO:  -- versus inside.

14          So what I am saying is these defendants were there

15   for a long time.  They had a long time to observe the chaos;

16   to make the decision for themselves:  This is something we

17   shouldn't be a part of and turn back and get out of there;

18   but they didn't.

19          They saw what was happening; they went in through

20   a -- very soon after one entry point was violently breached,

21   and they remained inside for a -- as far as I can tell,

22   longer than anyone; possibly longer than anyone else who has

23   been sentenced so far.

24          THE COURT:  Go ahead.

25          MR. MEINERO:  The day after January 6th, Your

1    Honor -- or, actually, after they left the Capitol, they

2    drove back to Wisconsin.

3           Early in the morning on January 7th, after they

4    would have had time to reflect on their conduct and the

5    consequences of it, they texted each other about their

6    experience of the prior day; they weren't regretful, they

7    were proud.  Mr. Nelson texted Mr. Markofski:  We held the

8    line, no backing down.  Mr. Markofski replied:  Oh, fuck

9    yeah, brothers and patriots; won't go down without a fight.

10   Mr. Nelson responded:  Not I.

11          Your Honor, before I address the mitigating

12   factors in this case, I was going to address the issue of

13   disparity.  I don't know how much depth you want me to go in

14   or how much weight this Court will place on that factor

15   under 3553(a).

16          I will say, as a very simple matter, these

17   defendants are distinguishable, as I just mentioned, from

18   practically every other defendant so far in their length of

19   time in the Capitol.  And I know the defense has mentioned a

20   few cases, or cited a few cases, and can compare

21   defendants -- those defendants to Mr. Nelson and

22   Mr. Markofski; these are highly fact-specific assessments,

23   Your Honor.

24          The permutations of aggravating and mitigating

25   factors for each one of the defendants is limitless; but

1    there were five -- I'm focusing on a few the defense cited.

2    There was Sean Cordon and Danielle Doyle who received

3    sentences of two months' probation; those sentences appear

4    to be outliers in the table of -- we attached to our

5    sentencing memo.  Those --

6            THE COURT:  Let me -- let me give this assessment,

7    and you tell me where it's wrong.

8            My assessment, from looking -- as you have done --

9    at the cases that have been sentenced so far for pleas to

10   this offense, one count, 5104(e)(2)(G) -- and there have

11   been more than a handful of those; we are now getting a body

12   of sentencings.

13           I would say that the most common sentence has been

14   a sentence of probation, and probation for more than the one

15   or two months that you mentioned; something more typically

16   of two years' probation, I think.  There have been occasions

17   of more than two years, but not many.  There have been

18   occasions of periods of incarceration, but not usually.

19           So it seems to me that it might be fair to say

20   that the outliers are, as you mentioned, at the bottom;

21   probation for a month or two, or no probation at all -- at

22   least in one instance, I think.  And the outliers at the

23   upper end are periods of incarceration or very lengthy

24   periods of probation, five or four years.

25           Why is that not an accurate assessment of the

1    sentencings under the 51 -- under this provision to date?

2              MR. MEINERO:  I think the median or means

3    sentence, Your Honor, probably is somewhere in the realm of

4    24 months -- I'm sorry -- yes, 24 months of probation with

5    home detention; sort of an intermediate between straight

6    probation and incarceration.  We are seeing, more recently,

7    more and more sentences of incarceration.

8              I am just looking at the list we provided.  I am

9    trying to count on the fly here how many sentences of

10   incarceration there have been.  We have it organized by what

11   the government recommended.

12             But I am counting 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

13   11 -- I have counted 12 sentences of incarceration, Your

14   Honor, at least 12 sentences -- from this table of what the

15   Court's imposed.  So that is about one fourth, or so, of the

16   defendants who have been sentenced so far.  I may be off by

17   a few here, Your Honor -- and I'm sorry I don't have a more

18   definitive answer of the number of defendants who have

19   received sentences of incarceration; but that sounds about

20   accurate to me.

21             So a sentence of incarceration here would be in

22   line -- we are getting into some of the more serious cases

23   or -- some of the individuals who were on this spectrum of

24   conduct are more towards the middle or the higher end of

25   criminal conduct for this offense.

```
 1              THE COURT:  Why do you say that?  What is the

 2    evidence that we're now dealing with the more serious cases

 3    of this conduct, which is the parading or demonstrating in

 4    the Capitol?

 5              MR. MEINERO:  Well, we're getting more instances

 6    of individuals who engaged in belligerent conduct; I know

 7    that's what the defense cited to --

 8              THE COURT:  But that is not this case.  That is

 9    not this case.

10              MR. MEINERO:  In this case there is not

11    belligerent -- the physical belligerent conduct committed by

12    these defendants; that is correct.

13              However, as I noted, what distinguishes them --

14    what distinguishes them from the others is the duration.

15    And also, Your Honor, I haven't mentioned this yet --

16    because it also goes to mitigation, at least from the

17    defense's perspective -- is these defendants have military

18    service in their background which we see as an aggravating

19    factor here.

20              The reason we see that as an aggravating factor --

21    and, first, I want to state very clearly there is possibly

22    no greater service one can render to the nation than that

23    service; and that service is worthy of the highest respect

24    and praise to Mr. Nelson and to Mr. Markofski.

25              However, they also swore an oath to uphold and
```

1    defend the Constitution.  They were in a special position to

2    understand that oath and to appreciate what this attack on

3    democracy meant.  So we see that as an aggravating factor

4    here because what they did flew in the face of the oath they

5    took.

6            THE COURT:  Well, I see the military service as

7    cutting both ways.  It seems to me that normally it's

8    something that cuts in favor of a criminal defendant.  That

9    kind of community service -- that kind of service to the

10   nation is something that is a plus mark for them in

11   consideration of sentencing; that's part of the nature and

12   characteristics of the defendant.

13           But, on the other hand, as you say, within a

14   criminal offense, but particularly this offense, where it

15   involved -- with a threat to our democratic process, it

16   is -- and our constitutional considerations -- it is

17   something that gives the Court pause with respect to the

18   individuals who, notwithstanding their obligations, engaged

19   in this conduct; so it seems to me that that cuts both ways.

20           I would not call it an "aggravating factor"; but I

21   would call it a factor that needs to be considered on both

22   sides of the equation.

23           MR. MEINERO:  And I think the way we see it --

24   again, crediting them for that service -- we see that as

25   troubling and more confounding as to why they decided to

1    engage in misconduct; and that's why we mentioned it.

2          Your Honor, I also want to address some of the

3    other mitigating factors here which you mentioned earlier.

4    These defendants have no adult convictions, both have

5    complied with the conditions of their pretrial release; both

6    cooperated at an early stage of the investigation.

7          Mr. Nelson submitted to a prearrest interview and

8    admitted that he entered the Capitol during that prearrest

9    interview.  He submitted to a post-arrest interview.  He

10   gave consent to search his apartment and identify where FBI

11   agents could find clothing evidence there, which was

12   helpful.

13         I will say some -- more on the negative end, he

14   did minimize his conduct during his post-arrest interview.

15   He suggested because the doors had been breached already and

16   because the Capitol is a public building -- he suggested

17   that he did not know that that was unlawful.  But when the

18   interviewing agent confronted him about that and noted that

19   the doors he had entered had smashed windows, he backed away

20   from that statement; and he said, no, I hear what you are

21   saying.

22         Mr. Markofski also, he cooperated at an early

23   stage.  He submitted to two prearrest interviews; and, at

24   first, he admitted that he entered the Capitol.  At the

25   second -- it wasn't so much an interview, as it was a

1    meeting for him to turn over video and photo evidence to the

2    FBI; and he did that.  During the post-arrest interview, he

3    confirmed he had entered the building.  He identified where

4    evidence could be found in his residence and car, and

5    provided the unlock code to his cell phone.

6          I will say this -- and this was more negative than

7    Mr. Nelson.  Mr. Markofski minimized his conduct more in his

8    post-arrest interview and expressed incredulity that he

9    committed a crime because he saw no trespassing signs and

10   because law enforcement did not stop him; that incredulity

11   was misplaced.

12         THE COURT:  It's important -- Mr. Meinero, it's

13   important to consider not only just what was said in the

14   post-arrest interviews, but what the positions of the

15   defendants are today.

16         MR. MEINERO:  Absolutely, Your Honor.

17         THE COURT:  And you are not saying that either

18   defendant is doing anything other than admitting in full

19   their conduct and how wrong they were to engage in that

20   conduct?

21         MR. MEINERO:  That -- I was going to mention that

22   in about 30 seconds, Your Honor.

23         THE COURT:  Okay.

24         MR. MEINERO:  But, before that, I also wanted to

25   underscore that they both expressed an early desire to

1    express -- to accept responsibility here.

2              Getting to what you just said, Your Honor, and

3    their remorse; in their sentencing submissions, they both

4    made worthy statements of contrition.

5              Mr. Nelson made, I felt, a very poignant statement

6    about he was ashamed he committed a crime that made fellow

7    citizens and people around him fearful of him.  And he

8    acknowledged the irony that if he had still been in the

9    National Guard he would have been called up to restore

10   order; that struck me quite a bit.

11             In a similar vein, Mr. Markofski, a current

12   guardsman, acknowledged that his actions put his oath in

13   question and, in his words, brought dishonor to his beloved

14   U.S. Army National Guard.  So, absolutely, Your Honor, those

15   statements deserve credit.  It still brings us, the

16   government, back to having taken those oaths and still going

17   into the building in the first place.

18             This attack was akin to a battle.  There was

19   hand-to-hand combat that occurred at the Capitol over hours;

20   and, unfortunately, they chose the side that was against

21   democracy; and they went in and remained for 85 minutes.

22   Alas, that's something they have to live with and something

23   they must be held accountable for.

24             THE COURT:  Let me make sure that I have the

25   government's position clear on other factors.

1          There is no allegation that either of these

2    defendants engaged in any violent conduct, correct?

3          MR. MEINERO:  Correct.

4          THE COURT:  There is no allegation that they

5    engaged in any acts of destruction, correct?

6          MR. MEINERO:  Correct.

7          THE COURT:  Is there any allegation that they

8    witnessed acts of violence or destruction and ignored or

9    took some inappropriate steps?

10          MR. MEINERO:  The video from inside the crypt that

11    I mentioned, Your Honor -- as I said, they came into view,

12    in the Capitol surveillance video, about five minutes before

13    the mob that preceded them and that grew, after they had

14    entered -- had breached that line and overwhelmed the

15    officers, and then gained entry to the Capitol.

16          I can't say that -- well, I can't say that these

17    defendants represented explicitly that they saw violence

18    committed against anyone.  However, Mr. Nelson -- based on

19    what he said he saw before entering, that pepper balls were

20    deployed.  He also said that he had witnessed rioters

21    accosting police officers in the Rotunda; and that's at the

22    time that officers began driving rioters out of that space,

23    and rioters were pushing and shoving to get out of the

24    building.

25          So -- and let me also say this.  We believe -- or

1    at least we don't have evidence to the contrary that they

2    were separated for any prolonged period during their time

3    inside the Capitol; as far as we know they were together

4    this whole time.  So that is -- those are things that

5    Mr. Markofski also would have seen.  So I hope that answers

6    your question, Your Honor.

7            But we do believe that they would have -- during

8    this very long time outside and inside the Capitol, have

9    seen things that would have, at least, been chaotic but,

10   also, they would have seen these interactions with officers

11   and the officers being overwhelmed, and activity of that

12   nature.

13           THE COURT:  Mr. Meinero, I am not going to accept

14   that.

15           The government has listed one of the factors as

16   being the defendant's reaction to acts of violence or

17   destruction.  What you are saying is anyone who was there

18   must have seen acts of violence or destruction, and they

19   didn't stop them; that's not a factor then.  That would be

20   something -- the way you explain it, it's something that

21   would apply to everyone who was there.

22           We're trying to differentiate on a spectrum.  When

23   differentiating on a spectrum, it seems to me the government

24   has no evidence or indication that they witnessed and had

25   some improper reaction to acts of violence or destruction;

1    otherwise you are saying that anyone --

2              MR. MEINERO:  We have --

3              THE COURT:  -- must have seen things and,

4    therefore, that should be held against them.

5              MR. MEINERO:  Well, we also -- well, let me just

6    get to the first part.

7              We have Mr. Nelson's words that he saw rioters

8    accosting police officers.  So -- now, whether that is the

9    level of violence you are talking about as far as assaults;

10   I can't say that, Your Honor.

11             However, they would have been in there a long

12   period, as opposed to other rioters who may have gone in for

13   only a few minutes and seen much less than they did.

14             THE COURT:  But you are also saying that they

15   would have seen things outside, and that's true of everyone.

16             MR. MEINERO:  Yes.

17             THE COURT:  But enough on this factor.  Enough on

18   this factor.  I don't think that --

19             MR. MEINERO:  Yes.

20             THE COURT:  I don't think there is a very

21   strong -- I don't think this factor weighs strongly against

22   either of the defendants.

23             They didn't destroy evidence either, right?

24             MR. MEINERO:  No --

25             THE COURT:  Indeed, to some extent they helped the

1    government find -- helped the government locate evidence?

2           MR. MEINERO:  Correct.

3           THE COURT:  There are a couple of -- very

4    minimal -- statements on social media made immediately after

5    or, actually, one during the events.

6           MR. MEINERO:  I just want to -- I just want to

7    correct that for a moment, Your Honor.  They were texts,

8    private texts; they were not posted on social media.

9           THE COURT:  I'm sorry.  Texts, not social media.

10   Private texts; you are right.

11          MR. MEINERO:  Yes.

12          THE COURT:  But that's all.  There was nothing --

13   they weren't -- neither of these individuals said anything

14   beforehand, in terms of anticipation of some great activity

15   at the Capitol; and neither of them exhibited any planning,

16   and neither of them have exhibited in social media, texts or

17   otherwise, much in the way of cheering on what happened.

18          Now, there are these text statements right after

19   they were in the Capitol; but that's it, correct?

20          MR. MEINERO:  Yes.  That's correct.  There is not

21   evidence of preplanning, social media promotion of what

22   occurred; so that is correct, Your Honor.

23          The texts -- we mentioned the texts to show their

24   state of mind about how they felt about what they did.

25          Mr. Markofski texted a friend saying he stormed

1    the Capitol -- or we stormed the Capitol and shut it down.

2    Then there was a text the two defendants shared with each

3    other after they went home to Wisconsin.

4              THE COURT:  Okay.  All right.  I think we have

5    exhausted the factors.

6              Anything else that you want to say, please do so,

7    Mr. Meinero.

8              MR. MEINERO:  Your Honor, I am finished.  And that

9    is -- for all of the reasons I mentioned, that's why we

10   recommend a sentence of 14 days' incarceration for the

11   defendants, plus the $500 restitution to the Architect of

12   the Capitol, and the $10 special assessment.

13             Thank you.

14             THE COURT:  All right.  Thank you, Mr. Meinero.

15             So, now, Ms. Ettinger, I think -- just because I

16   have listed Mr. Nelson first, I am going to turn to you

17   first, and then to Mr. Nelson; and then I will turn to

18   Mr. Bednarek, and then to Mr. Markofski.

19             Ms. Ettinger.

20             MS. ETTINGER:  Certainly, Your Honor.  Thank you.

21             People should not have to be fearful of fellow

22   citizens and people they arrest; those are Mr. Nelson's

23   words in reflection on his conduct on January 6th, and they

24   articulate some of the deepest hurt that's flowed from the

25   riots.  Americans are fearful of other Americans; Mr. Nelson

1    gets it.

2          As the defense has set out in its sentencing memo,

3    he is someone who cares very deeply about other people, and

4    about his service to others; and his conduct in this case is

5    an aberration in an otherwise law-abiding life.  His role in

6    the breach is limited; and he's shown deep and true remorse

7    for his conduct and, for that reason, the defense is

8    requesting a sentence of probation in this case.

9          The country is not just feared; it's angry and

10   disappointed about what happened on the 6th.  But anger,

11   fear, and disappointment don't define just punishment.

12         Instead, as Your Honor has mentioned, it's found

13   in assessing the spectrum of misconduct from that day, and

14   finding Mr. Nelson's place along it.

15         The government has tried to point to three

16   aggravating factors, and I'd like to look at each of them

17   because our position is that none of the three pushes this

18   case into the realm of one deserving incarceration.

19         First, the government spent quite a bit of time

20   talking about the length of time that Mr. Nelson was inside

21   the Capitol.  But any amount of time inside the Capitol was

22   unlawful, and the amount of time spent shouldn't be the

23   metric by which we differentiate terms of probation or terms

24   of jail time.

25         Instead, we should be looking at what happened

1    inside the Capitol and what were Mr. Nelson's actions

2    afterwards because those are the factors that indicate

3    whether there is a risk that he's going to do something like

4    this again; and that more closely aligns with the analysis

5    under 3553.

6           So when it comes to Mr. Nelson --

7           THE COURT:  Well, why -- why would you think that

8    the length of time in the building would be irrelevant?

9           I understand that you want to put it in the

10   context of other factors and other considerations; but why

11   would that be irrelevant?

12          Doesn't it make a difference if someone was

13   breaching the Capitol and violating the law for two minutes

14   versus two hours?

15          MS. ETTINGER:  I don't mean to suggest it's

16   irrelevant, Your Honor, because the last thing I want to do

17   is to downplay the conduct, but certainly not Mr. Nelson's

18   position.  But it can't have such disproportionate weight

19   that it loses meaning; the context is exactly the point that

20   I would like to emphasize.

21          And so what Mr. Nelson was doing during those 85

22   minutes is more important than just the mere cosmetic fact

23   that he was there for 85 minutes.

24          So if I may, Your Honor, adding on to that

25   context, Mr. Nelson's conduct at the Capitol was that he

1    walked in through a door.  He was a wrongful spectator to

2    others' destruction.  He made a video that he texted to his

3    mother, and he left.

4            He is not dressed for battle, like Mr. Sean

5    Cordon; he is not throwing chairs at the police, like

6    Mr. Bradley Rukstales; he is not videotaping police officers

7    being assaulted, like Mr. Robert Reeder.  And his behavior

8    from waking hours of January 7th onward has been nothing but

9    remorseful.

10            And so that bleeds into the second aggravating

11   factor that the government has pointed to, which is this

12   text message exchange between Mr. Nelson and Mr. Markofski.

13   That text exchange doesn't happen, as the government

14   suggested, after there's been real time to reflect on their

15   actions; it happened at one o'clock in the morning after

16   having undertaken a very long drive from Washington back to

17   Wisconsin.

18            And so what really matters is not how they were

19   feeling so caught up in the buzz of the day, but what they

20   said in the days, months, since then; the weeks that

21   followed.  And in that period --

22            THE COURT:  Clarify -- clarify one thing for me.

23   That text exchange is between them as they are in the car

24   driving?

25            MS. ETTINGER:  It was at 1:19 to 1:20 in the

1    morning.  I am not certain whether they were still in the

2    car versus on the way home.

3              On the way home.

4              THE COURT:  Okay.  Go ahead.

5              MS. ETTINGER:  But in the weeks that followed,

6    Mr. Nelson, as the government emphasized, he meets twice

7    with the FBI, cooperates fully, was charged, and pleads

8    guilty.

9              But even more important than those actions, Your

10   Honor, I think that he spent time reflecting on what

11   happened and dedicating himself to making changes in his

12   thinking and his behavior, refocusing on his work, and

13   moving forward with his life.

14             He certainly is not Mr. John Lolos, who is still

15   chanting and giving war cries on the Delta flight home; he

16   is not posting on Facebook like Ms. Dona Sue Bissey; and

17   he's not Ms. Lori Vinson telling the media, in multiple

18   interviews, that she'd do it all over again.

19             Mr. Nelson goes back to work at Mendota; he's

20   pulling overtime shifts to support a very difficult (sic)

21   community of Haitians.  And he's distancing himself from

22   politics altogether.

23             I will touch just briefly, Your Honor, on the last

24   of what the government terms an aggravating factor.  We, of

25   course, agree with the Court that it is the wrong thing to

1    call out somebody's military service; there is no however or

2    but that follows --

3              THE COURT:  I don't think -- I don't think I said

4    that.  I said that it was a double-edged sword; it both

5    favored and disfavored him.

6              MS. ETTINGER:  Understood, Your Honor.  I must

7    have misheard.

8              I think what I would submit to the Court is this:

9    Rather than making Mr. Nelson more culpable, Mr. Nelson's

10   military service has made him more contrite.  He is

11   horrified to have participated in an act that caused harm to

12   our country, particularly because he wore a uniform; and

13   that shame and guilt is going to reverberate long after this

14   hearing, and it is something that he is going to carry with

15   him for the rest of his life.

16             So in the end, Your Honor, each of the factors

17   weighs in favor of probation here; Mr. Nelson's focus on

18   serving others; his lack of criminal history; his wrongful,

19   but limited role in the riot.  He is somebody who helps the

20   public, not somebody from whom the public needs protection.

21             There is not a risk that he is going to

22   participate in anything like this again.  A sentence of

23   probation is serious, and it sends a message; it's

24   sufficient, but not greater than necessary.  Thank you.

25             THE COURT:  Thank you, Ms. Ettinger.

 1              Does Mr. Nelson wish to say something?

 2              DEFENDANT NELSON:  Yes, Your Honor.

 3              MS. ETTINGER:  Yes, sir.

 4              THE COURT:  Please.  Good afternoon, Mr. Nelson.

 5              DEFENDANT NELSON:  Can you hear me?

 6              THE COURT:  I can.

 7              DEFENDANT NELSON:  I just wanted to express how

 8    sorry I am for being a part of the breach in and of itself.

 9              Obviously I observed the damage to the building,

10    but I think what is a lot worse was that day we became

11    further apart as a country, not closer.  And I wanted to say

12    I'm sorry to the families and anyone affected by the

13    violence; obviously, particularly, law enforcement.  And I

14    know there was an officer that took his life in the

15    aftermath of that; and so that doesn't -- that doesn't make

16    me feel very good.

17              And obviously that day I had bad judgment; there

18    is no question about it.  I wish I had made better

19    decisions.  But since then I have been working to distance

20    myself from toxic politics, which obviously this was.

21              I can't go back in time.  Sometimes I wish that I

22    could.  But I guess what I can do going forward is working

23    as hard as I possibly can to learn from all of this, and

24    hopefully put it behind me.

25              THE COURT:  All right.  Thank you, Mr. Nelson.

1              Mr. Bednarek, you are up.

2              MR. BEDNAREK:  Thank you, Judge.

3              And I guess one of the benefits of going last is

4     that I have the benefit of hearing everybody else's

5     positions and arguments to this point; and it's obvious that

6     Mr. Nelson and Mr. Markofski are similarly situated --

7     obviously legally; but also, I think, in the arguments that

8     I would have made.  I mean, many of the arguments that I

9     would have made have been made for me either by the Court or

10    by my esteemed colleague who represents Mr. Nelson; so I am

11    not going to rehash on any of those.  In fact, I will try to

12    be fairly brief.

13             I submitted a sentencing memorandum in which I

14    intended to provide the vast majority of argument.  But as

15    with all sentencing hearings of any type -- let alone this

16    type -- you know, things come up that make me want to

17    comment.  And one of the things that we have talked a fair

18    bit about is, as you've referred to, the double-edged sword

19    of the military aspect; I really agree with that, Judge.

20             In fact, in preparation, I was wondering about how

21    to address this with the Court because I understand your

22    concern that it cuts both ways.

23             But the one thing that we haven't talked about, at

24    least with respect to Mr. Markofski, is that the effect of

25    this case and this conviction -- the collateral effect on

1        his military career is as yet undetermined.  And it seems to

2        me to be very potentially significant and falls into the

3        realm of punishment.  And I say that because he -- well, in

4        the letters and in my sentencing memorandum, I indicate that

5        this has had impact on his progression in the military, and

6        potentially a lack thereof.

7                The other thing that Mr. Markofski benefited

8        from -- and it's clearly in question at this point -- is the

9        financial assistance with his education that is a function

10       of his military career.  I don't know what his financial aid

11       future looks like; and I don't know -- and nor does he

12       know -- what his college career looks like from a financial

13       perspective because of the military implications of that.

14               I say that because I feel as though that

15       collateral consequence is going to be felt by Mr. Markofski

16       no matter what sentence you hand down today.  You can give

17       him a fine, and still the military is taking action against

18       him.  So there are effects from this conviction that go

19       beyond what we're talking about today, at least with respect

20       to Mr. Markofski.

21               The other one, as I referenced in my memorandum,

22       is his employment; he was immediately terminated.  We

23       have -- in Wisconsin there is a fairly large conglomerate of

24       convenience stores and gas stations; they are called

25       Kwik Trip.  It's actually headquartered in La Crosse,

1    Wisconsin, very near where to Mr. Markofski lives.  He got a

2    job there; they found out about this; they let him go.

3          I suspect that future employers may well have

4    concerns, if you will, about Mr. Markofski because of this.

5    I say that because that's another collateral consequence

6    that's going to be felt no matter what happens today.

7          Judge, one of the other things I did in

8    preparation for today -- I have re-read the memorandum, of

9    course, and all of the attachments.  And I think it's near

10   to the end of the attachments, the letter from

11   Mr. Markofski's father; he said something, I wrote it down

12   here.  He said:  It's not our mistakes that define us, but

13   it's how we respond to them.  I can't script --

14          THE COURT:  I noted that -- I noted that in his

15   letter as well.

16          MR. BEDNAREK:  Yes.  I can't script a better

17   response to his actions than what Mr. Markofski has done to

18   date.  Right?

19          I mean, we can't condone the actions; I get that.

20   That's why he's here; that's why he's pled guilty.  But

21   everything he has done -- frankly, before and after, has

22   been totally consistent with somebody that's deserving of a

23   probation sentence and not worthy of somebody that needs to

24   be incarcerated.  I feel pretty strongly about that.  And I

25   make a career of defending people that I don't get to say

1     that about.

2          Mr. Markofski is the kind of man that everybody

3     would want to call his son, his friend, his colleague, his

4     military partner -- pick the pronoun.  And he would be the

5     one that you would want in a foxhole next to you, in a

6     classroom next to you, working with you on a job site.

7          And so I, for one, am extremely optimistic about

8     his future; and I say that wholeheartedly, Judge.  So I just

9     ask that you follow the recommendation that presentence has

10    prepared, and let's do a term of probation.  I don't believe

11    incarceration is at all necessary.  And let's not forget, if

12    he fails on probation, that's what happens; we incarcerate.

13    I believe he deserves a chance.

14         So that's what I have for you, Judge.  But I stand

15    ready to answer any questions or address concerns that the

16    Court may have.  Thank you.

17         THE COURT:  So tell me why, from your perspective,

18    the length of his stay inside the Capitol is not enough of

19    an aggravating factor to warrant a sentence at the higher

20    end of the spectrum?

21         MR. BEDNAREK:  Because I would ask not only how

22    long he was in the Capitol but, really, I think what the

23    touchstone should be:  What did he do in the Capitol?

24         There were lots and lots of people that were

25    breaking windows; that were accosting police officers; that

1    were engaging in behavior both in the Capitol -- that is far

2    more egregious.  To me, his -- this is not to condone it,

3    Judge, I don't mean that; but it's to set it apart from

4    others.  His was, essentially, a mere presence in the

5    Capitol.

6              Now, again, that's not legal, as we all know; but

7    he is not in there breaking windows or tossing chairs, as my

8    colleague pointed out.  He was -- and I will maybe use air

9    quotes -- he was, sort of, benign in his behavior whilst he

10   was in the Capitol; that's why I don't think the length of

11   time aggravates.

12             THE COURT:  All right.  Thank you, Mr. Bednarek.

13             Now, does Mr. Markofski have something he wishes

14   to say?

15             MR. BEDNAREK:  He does.  Thank you.

16             THE COURT:  Mr. Markofski, good afternoon.

17             DEFENDANT MARKOFSKI:  Good afternoon, Your Honor.

18             Your Honor, I understand that my lawyer has

19   provided you with my written allocution and how you have

20   read it already.  I want to emphasize only one point, to

21   you, to the government, and to all of the police officers

22   present on the Capitol on January 6th, I'm sorry.

23             Thank you.

24             THE COURT:  All right.  Thank you, Mr. Markofski.

25             All right.  I am going to make some general

1    observations -- well, not many -- and then talk about each

2    of the defendants as I determine the sentence to be imposed

3    for each.

4             First, let me just say that I have received the

5    presentence investigation reports as to Mr. Nelson and

6    Mr. Markofski; sentencing memoranda -- not just from the

7    government, but from each of the defendants; a supplement

8    from Mr. Nelson; and letters of support for both Mr. Nelson

9    and Mr. Markofski.  I have read them all and take them all

10   into account, along with what has been said here this

11   afternoon in determining the appropriate sentence in each of

12   these cases.

13            Both of the defendants have agreed to pay -- and I

14   believe have already taken steps to pay -- the restitution

15   of $500 that they agreed to; and I will order that amount of

16   restitution as part of the sentence in this case with

17   respect to each of the defendants.

18            I think they have also paid or taken steps to pay

19   the $10 statutory assessment that is required as well.

20            That brings me to the other monetary

21   consideration, which is a fine.  And I say this in the

22   context of the remainder of the sentence that I am going to

23   impose in each of these cases.  I believe that fines are

24   warranted in these two cases, especially given what I am

25   going to impose as the remainder of the sentence.

1          Mr. Nelson, based on the information provided to

2    me -- notwithstanding his recent decision with respect to

3    his employment -- I believe Mr. Nelson has an ability to pay

4    a fine; and I am going to impose a fine with respect to

5    Mr. Nelson.

6          Mr. Markofski's ability to pay a fine is perhaps a

7    little less; but I believe that he, too, has the ability to

8    pay a fine.  I am going to impose a fine because I think it

9    is warranted; and it will, however, be a somewhat less

10   significant fine than Mr. Nelson.

11         So now I am going to go through the reasons for

12   sentences in these cases and also state what the sentences

13   will be.

14         I will give counsel one final opportunity, after I

15   do so, to make any legal objection before I formally impose

16   the sentence; but I will only go through it once.

17         We need to start with the nature of the offenses

18   here.

19         I don't think anyone is going to question that

20   these are very serious offenses.  Even though they're just

21   misdemeanors, these are serious offenses; they involved a

22   threat to our democratic process, and an attack on our

23   democratic values.  As the D.C. Circuit yesterday stated:

24   The events of January 6th were the most significant assault

25   on the Capitol since the war of 1812; that was during war

1    time, this was not.

2            Indeed, this is the single, as, again, the D.C.

3    Circuit said -- this is the single, most deadly attack on

4    the Capitol, by domestic forces, in the history of the

5    United States; and it took lives, we cannot ignore that.

6    And we cannot ignore the seriousness of the events and,

7    therefore, all of the participants in the events of

8    January 6th.

9            The defendants participated in an event, basically

10   a riot, or an insurrection, that undermined our electoral

11   process.  And the fact that their offenses -- basically

12   entering and roaming about the Capitol -- for over an hour

13   were less serious than those of others who assaulted

14   officers, destroyed property, breached doors or windows, or

15   police lines, encouraged violence, and did those other more

16   serious things -- that does not make these offenses

17   something that is not serious.  These offenses remain as

18   very serious offenses and affronts to our democratic values.

19           On the other hand, they do fall on the lower end

20   of the spectrum of offenses; the fact that these are just

21   misdemeanors, and the plea has been taken to a single

22   misdemeanor of parading and demonstrating in the Capitol

23   Building, is an indication that they are on the lower end of

24   the spectrum of offenses; and it's really only the length

25   that each defendant was inside the Capitol that favors a

1    harsher sentence in this case.

2           The government has not really pointed to anything

3    beyond that, with the exception of the military service that

4    I will mention again in a moment.

5           Everything else about the conduct of these

6    defendants would, under the nine-factor test that the

7    government has identified, would support a lesser sentence.

8           They did not engage in violent conduct; they did

9    not incite violence; they didn't engage in any acts of

10   destruction; they really didn't witness and have a bad

11   reaction to any acts of violence or destruction, as I have

12   discussed with the government here today; they did not

13   destroy evidence during nor after the riot; and, indeed,

14   were helpful in locating evidence when the government

15   approached them.

16          They were -- as I mentioned and as has been

17   highlighted by the government, inside the building for a

18   long time, although they did not go into closed offices, it

19   looks like they were more in the open area of the Rotunda

20   and the adjoining areas.

21          There were not statements made by these defendants

22   in person, on social media, or even through texts that put

23   them in the category of individuals who are continuing to

24   show pride in or support the activities on January 6th; to

25   the contrary, these defendants have cooperated fully with

1    law enforcement, did so early; have exhibited strong

2    evidence of remorse and contrition; and those factors, with

3    the exception of the length of time, really support placing

4    them on the lower end of the spectrum for sentencing.

5           How they entered the Capitol Building is, in my

6    view, perhaps slightly in their favor, or at least neutral.

7    They didn't break down a door, breach the police line.  They

8    simply walked through the door that had been already opened;

9    now, that doesn't condone their conduct, but that's one

10   factor that the government thinks is important.  I think

11   it's either a neutral factor or even slightly in their

12   favor.

13          It's very important to me that they have shown

14   full remorse and acceptance of responsibility and have

15   acknowledged explicitly that the conduct they engaged in was

16   wrong; there is no equivocation on that.

17          Now we don't have guidelines to help in sentencing

18   here; but I think that that collection of factors is

19   important.  For Mr. Nelson, he has accepted responsibility;

20   shown remorse; admitted that his conduct was wrong and

21   unlawful.  He has minimal social media or text comments that

22   would weigh against him; no prior offenses; was not involved

23   in any planning or anticipation with respect to the

24   January 6th events, or praise thereafter.  He does have

25   service to his country and to his community, and family and

1     community support.

2          Now, the service to the country, as I have already

3     said, it cuts both ways; and I don't think I have to dwell

4     on that anymore; it is a factor in the nature and

5     characteristics of Mr. Nelson, but it also raises the

6     question as to why one who had that training, took those

7     oaths, would nonetheless engage in this kind of conduct.  He

8     has been employed, been a contributing member of society;

9     and, again, has recognized that his conduct was wrong and

10    even shameful.  His service to others is commendable; and

11    his cooperation in the case is also commendable.

12         The same is true for Mr. Markofski, generally

13    speaking.  He has accepted responsibility; shown remorse;

14    admitted that his conduct was wrong; has minimal social

15    media or texts, or other comments that would continue to

16    support the activities on January 6th.  He has been -- he

17    has shown full contrition.  He has no prior offenses; was

18    not engaged in any planning or any anticipation with respect

19    to the events of January 6th.

20         He and Mr. Nelson both have indicated they came to

21    go to the rally and to hear then President Trump at a rally.

22         He has service to the country and to the

23    community, and has strong family and community support; and

24    that service to the country, through his military service,

25    is the same two-edged sword for him, as it is for

1    Mr. Nelson.

2             He has had steady employment and schooling that he

3    has been engaged in; and he knows that his conduct was both

4    criminal and wrong and, indeed, was an affront to his

5    military training.  He has, as his counsel has noted,

6    experienced collateral consequences already as a result of

7    his involvement in the January 6th events, and his plea of

8    guilty to this Class B misdemeanor.

9             So where do I come out on sentencing?

10            I am going to impose a relatively small fine for

11   each, restitution as well.  I am going to impose some hours

12   of community service, and two years of probation.  Not a

13   minimal period of probation, but a significant period of

14   probation.  Probation is a serious, weighty sentence, as the

15   Supreme Court and other courts have noted.

16            The primary factor that requires more discussion

17   under 3553(a) -- and there are six factors, the nature and

18   circumstances of the offense, history and characteristics of

19   the defendant -- I have already been through those.

20            The need to reflect the seriousness of the

21   offense, this sentence that I am going to impose does so, in

22   my view, and will promote respect for the law and provide

23   just punishment and, also, afford adequate deterrence both

24   to the individual defendants and to others, more generally.

25   And I think that is true in the context of these cases

1    involving January 6th where you really can't isolate one

2    case.  It's the overall government effort, with respect to

3    these events and the serious, serious criminal justice

4    effort that the government has initiated with respect to

5    hundreds of individuals that is going to be a great

6    deterrence; and the sentences that Mr. Markofski and

7    Mr. Nelson will be getting are a part of that.

8         The last factor is the need to avoid unwarranted

9    sentence disparities among defendants with similar records

10   who have been found guilty of similar conduct; that's a hard

11   one to assess, but we do have more and more cases; and

12   Mr. Meinero has discussed them somewhat.

13        Looking at the cases that involve pleas to one

14   count of a 5104(e)(2)(G) offense, most of those defendants,

15   by far -- the overwhelming majority -- have received

16   sentences of probation, not incarceration.  They range, as

17   has been pointed out, from probation of just a month or

18   two -- one judge has done that in a couple of cases -- all

19   the way up to several years, even, I think, five years of

20   probation in at least one instance.  And they -- some,

21   perhaps, now, more than a handful -- but, still, a clear

22   minority of the sentences have involved a short term of

23   incarceration.  Two weeks is not an unusual term as

24   requested by the government.

25        Where incarceration has been imposed, it is my

1    sense that it is generally based on more reasons for it than

2    we have here.  The length of time in the Capitol was the

3    only thing that really supports a more serious sentence

4    here.  But for those other cases where incarceration was

5    imposed, you have other factors that have weighed in favor

6    of a sentence of incarceration.

7        If you have a defendant that is fully remorseful,

8    has fully accepted responsibility, has acknowledged the

9    wrong of their conduct, and that it was an error -- that

10   they were only involved in entering the Capitol, not any

11   violence or destruction of property, or any praising of the

12   events or incitement of others, and that -- they have really

13   not done anything before, during, or after to encourage or

14   praise such conduct -- I conclude that probation is

15   appropriate for these two defendants.  It is especially true

16   given their history of service to the community, including

17   military service, and the fact that there is no risk, in my

18   judgment, of their repeating this kind of conduct.

19       Probation is a sufficient deterrence in the

20   context of the scores of cases that have been brought and,

21   therefore, that is the sentence that the Court will impose.

22       I am now going to read the sentence to be imposed

23   in each of the cases; I will start with Mr. Nelson.

24       Pursuant to the Sentencing Reform Act of 1984, and

25   in consideration of the provisions of Title 18 of the U.S.

1    Code, Section 3553, it is the judgment of the Court that

2    you, Brandon Nelson, are hereby sentenced to a term of

3    24 months, that is two years, of probation on Count 4; in

4    addition, you are ordered to pay a special assessment of

5    $10, in accordance with 18 U.S.C. Section 3013.

6             The Court authorizes supervision in the

7    jurisdiction of this case to be transferred to the United

8    States District Court for the Western District of Wisconsin.

9             While on supervision, you shall abide by the

10   following mandatory conditions, as well as the standard

11   conditions of supervision, which are imposed to establish

12   the basic expectations for your conduct while on

13   supervision.

14            The mandatory conditions include that:  You must

15   not commit another federal, state, or local crime; that you

16   must not unlawfully possess a controlled substance; you must

17   refrain from any unlawful use of a controlled substance, and

18   submit to one drug test within 15 days of placement on

19   supervision, and at least two periodic drug tests

20   thereafter, as determined by the Court; that you must make

21   restitution, in accordance with Title 18 of the U.S. Code

22   Section 3663 and 3663(a), or any other statute authorizing

23   the sentence or restitution.

24            You are ordered to make restitution in the amount

25   of $500 to the Architect of the Capitol.  The Court has

1    determined that you do not have the ability to pay interest

2    and, therefore, waives any interest or penalties that may

3    accrue on that balance.

4            You shall comply with the following special

5    conditions:  You must provide the probation officer access

6    to any requested financial information, and authorize the

7    release of any financial information.  The probation office

8    may share financial information with the United States

9    Attorney's Office.

10           The defendant, Mr. Nelson, must complete 50 hours

11   of community service within 12 months; the probation office

12   will supervise the participation in the program by approving

13   the program.  The defendant must provide written

14   verification of completed hours to the probation office.

15           You are ordered to pay a fine in the amount of

16   $2,500.  The Court has determined that you do not have the

17   ability to pay interest and, therefore, waives any interest

18   or penalties that may accrue on the balance.  Having

19   assessed the defendant's ability to pay, payment of the

20   total criminal monetary penalties is due as follows:

21   Payment in monthly installments of $150 to commence 30 days

22   after the date of this judgment.

23           Restitution payments shall be made to the Clerk of

24   the Court for the United States District Court, District of

25   Columbia, for disbursement to the following victim; and that

1    is the Architect of the Capitol, at the address here in

2    Washington, D.C., in the amount of $500.  The financial

3    obligations are immediately payable to the Clerk of the

4    Court for the United States District Court, here in

5    Washington.  Within 30 days of any change of address, you

6    shall notify the Clerk of the Court of the change until such

7    time as the financial obligation is paid in full.

8            The probation office shall release the presentence

9    investigation report to all appropriate agencies, which

10   includes the United States Probation Office in the approved

11   district of residence in order to execute the sentence of

12   the Court.

13           Now, with respect to Mr. Markofski -- and excuse

14   me for one moment -- pursuant to the Sentencing Reform Act

15   of 1984, and in consideration of the provisions of Title 18

16   of the U.S. Code, Section 3553, it is the judgment of the

17   Court that you, Abram Markofski, are hereby sentenced to a

18   term of 24 months, that is two years, of probation on

19   Count 4.  In addition, you are ordered to pay a special

20   assessment of $10, in accordance with Section 3013 of

21   Title 18.

22           The Court authorizes supervision and jurisdiction

23   of this case to be transferred to the United States District

24   Court for the Western District of Wisconsin.

25           While on supervision, you shall abide by the

1    following mandatory conditions, as well as the standard

2    conditions of supervision, which are imposed to establish

3    the basic expectations for your conduct while on

4    supervision:  The mandatory conditions include that you must

5    not commit another federal, state, or local crime; you must

6    not unlawfully possess a controlled substance; you must

7    refrain from any unlawful use of a controlled substance, you

8    must submit to one drug test within 15 days of placement on

9    supervision, and at least two periodic drug tests thereafter

10   as determined by the Court; and you must make restitution,

11   in accordance with Title 18 of the U.S. Code, Section 35 --

12   I'm sorry -- 3663 and 3663(a), or any other statute

13   authorizing a sentence of restitution.

14          You are ordered to make restitution in the amount

15   of $500 to the Architect of the Capitol.  The Court has

16   determined that you do not have the ability to pay interest

17   and, therefore, waives any interest or penalties that may

18   accrue on the balance.

19          You shall comply with the following special

20   conditions:  You must provide the probation officer access

21   to any requested financial information, and authorize the

22   release of any financial information.  The probation office

23   may share financial information with the United States

24   Attorney's Office.

25          The defendant, Mr. Markofski, must complete

1 50 hours of community service within 12 months.  The

2 probation office will supervise the participation in the

3 program by approving the program.  The defendant must

4 provide written verification of completed hours to the

5 probation officer.

6    You are ordered to pay a fine in the amount of

7 $1,000.  The Court determines that you do not have the

8 ability to pay interest and, therefore, waives any interest

9 or penalties that may accrue on the balance.

10    Having assessed the defendant's ability to pay,

11 payment of the total criminal monetary penalties is due as

12 follows:  Payment in monthly installments of $100 to

13 commence 30 days after this date of the judgment.

14    Restitution payments shall be made to the Clerk of

15 the Court of the United States District Court here in

16 Washington for disbursement to the Architect of the Capitol

17 at its address here in Washington, and that amount is $500.

18    The financial obligations are immediately payable

19 to the Clerk of the Court for the U.S. District Court, in

20 Washington, D.C.  Within 30 days of any change of address,

21 you shall notify the Clerk of the Court of the change until

22 such time as the financial obligation is paid in full.

23    The probation office shall release the presentence

24 investigation report to all appropriate agencies, which

25 includes the United States Probation Office in the approved

1      district of residence in order to execute the sentence of

2      the Court.

3                Now, Mr. Nelson and Mr. Markofski, each of you was

4      convicted as a result of a plea of guilty.  You can appeal

5      your conviction if you believe that your guilty plea was

6      somehow unlawful or involuntary, or if there is some other

7      fundamental defect in the proceedings that was not waived by

8      your guilty plea.  You also have a statutory right to appeal

9      your sentence under certain circumstances, particularly if

10     you think the sentence is contrary to law.  However, a

11     defendant may waive those rights as part of a plea

12     agreement; and you have entered into a plea agreement which

13     waives some or all of your rights to appeal your conviction

14     and the sentence itself.  Such waivers are generally

15     enforceable; but if you believe the waiver is unenforceable,

16     you can present that theory to the appellate court.

17               You do have the right, each of you, to apply for

18     leave to appeal in forma pauperis.  And if you were to so

19     request and qualify, then the Clerk of the Court would

20     prepare and file a notice of appeal on your behalf; and that

21     would basically be free of cost, that's what that "in forma

22     pauperis" means.  But I note that you are represented by

23     very able counsel, in each instance, and presumably they

24     would assist you in this process if you wish to follow it.

25     With few exceptions, any notice of appeal must be filed

1    within 14 days of the entry of judgment; and I expect that

2    judgment -- given the lateness of the day -- may not be

3    entered today, but should be entered by Monday.

4            With that, let me ask counsel if there is any

5    reason, other than reasons that have been indicated here

6    today, why this sentence should not be imposed for each

7    defendant as I have just stated?  Ms. Ettinger?

8            MS. ETTINGER:  No, Your Honor.  No reason not to

9    impose the sentence as stated.

10           THE COURT:  Mr. Bednarek?

11           MR. BEDNAREK:  No.  No reason not to impose the

12   sentence as stated.

13           I may have missed this, but were Counts 1 through

14   3 dismissed?

15           THE COURT:  They will be in a moment.

16           MR. BEDNAREK:  Thank you.

17           THE COURT:  And then, Mr. Meinero, any reason not

18   to impose the sentence as I have just indicated, other than

19   what you have already argued?

20           MR. MEINERO:  No, sir.  No objection from the

21   government.

22           THE COURT:  All right.  With that, Mr. Meinero, is

23   there a further step we need to take with respect to the

24   information in this case?

25           MR. MEINERO:  There is, Your Honor.

1          The government moves to dismiss Counts 1 through 3

2     of the information pertaining to both defendants, Mr. Nelson

3     and Mr. Markofski, pursuant to the plea agreement.

4          THE COURT:  And that motion is granted.  And those

5     counts, Counts 1, 2, and 3 of the information in this case,

6     21-344, will be dismissed as to Mr. Nelson and as to

7     Mr. Markofski.

8          Anything else that we need to cover before I

9     formally impose the sentence, Mr. Meinero?

10         MR. MEINERO:  No, Your Honor.  Thank you.

11         THE COURT:  Ms. Ettinger?

12         MS. ETTINGER:  No, Your Honor.  Thank you.

13         THE COURT:  Mr. Bednarek?

14         MR. BEDNAREK:  Nothing, Your Honor.  Thank you.

15         THE COURT:  All right.  The sentences, therefore,

16     are imposed, as I have indicated, for Mr. Nelson and for

17     Mr. Markofski; those are the sentences of the Court.

18         And, with that, I believe we are done here today

19     for these cases.

20         I do want to say that I appreciate both the

21     seriousness of these offenses and, also, the remorse,

22     contrition, and acceptance of responsibility that each

23     defendant has indicated; and it is that that has kept you in

24     a sentence of probation rather than any other sentence.  And

25     I hope that is faith well placed in each of you; I think it

1   is; I certainly would be surprised to hear otherwise in the

2   future.

3           I hope that you will put these -- this conduct

4   behind you, but that you will continue to reflect on it and

5   on the importance of upholding the democratic values of this

6   great country, and abide by the rule of law and the

7   principles that are so valuable in our democratic process.

8           With that, this proceeding is completed; and I

9   thank you all very much.

10           THE COURTROOM DEPUTY:  All right.  This Honorable

11   Court stands in recess until return of court.  And good day,

12   everybody.

13           MR. MEINERO:  Thank you, Mr. Bradley.  Thank you,

14   Your Honor.  Thank you, Counsel.

15           (Whereupon, the proceeding concludes, 2:34 p.m.)

**CERTIFICATE**

16

17           I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
    certify that the foregoing constitutes a true and accurate
    transcript of my stenographic notes, and is a full, true,

18   and complete transcript of the proceedings to the best of my
    ability.

19           PLEASE NOTE:  This hearing was held via
    videoconference and telephonically, in compliance with the

20   COVID-19 pandemic stay-safer-at-home recommendations and is
    therefore subject to the limitations associated with the use

21   of technology, including but not limited to telephone signal
    interference, static, signal interruptions, and other

22   restrictions and limitations associated with remote court
    reporting via telephone, speakerphone, and/or

23   videoconferencing capabilities.

24   Dated this 21st day December, 2021.

25   /s/ Elizabeth Saint-Loth, RPR, FCRR
    Official Court Reporter